Lynne E. SOLOMON, parent and
natural guardian of Patricia
Solomon, et al., Appellants,

v.

John F. SOLOMON, Jr.

No. 74–1512.

United States Court of Appeals,
Third Circuit.

Argued Jan. 20, 1975.

Decided May 2, 1975.

Arthur L. Jenkins, Jr., Smith, Aker, Grossman, Hollinger & Jenkins, Norristown, Pa., for appellants.

Martin J. Cunningham, Jr., Henderson, Wetherill, O'Hey & Horsey, Norristown, Pa., for appellee.

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This appeal is from the district court's grant of summary judgment in favor of defendant-appellee. The district court ruled that plaintiff's diversity suit for non-support, based in contract upon a separation agreement executed in Pennsylvania, could not be maintained in the federal courts under the circumstances of this record. It premised this holding upon the federal courts' traditional policy against intervention in "domestic relations" cases. We conclude that the district court acted within its authority in holding that this case could not be maintained in federal court. We will, however, reverse the district court's entry of an order granting summary judgment and remand with directions to enter judgment dismissing this suit for want of subject matter jurisdiction.

### I.

Lynne E. Solomon ("plaintiff") and John F. Solomon, Jr. ("defendant") were married on August 16, 1958. Three children were born of this union. Marital difficulties arose and consequently, on November 22, 1968, husband and wife signed a separation agreement providing, *inter alia*, that the wife have custody of the children, that the husband pay a stipulated weekly amount for child support, and that—subject to certain restrictions—the husband be granted visitation rights. Paragraph 2(g) of the agreement provided in part:

" . . . in the event that the parties cannot resolve *the issue of Husband's future visitation rights* between themselves, they hereby agree to submit any dispute for resolution in the Court of Common Pleas of Montgomery County, Pennsylvania. Both parties herewith agree to submit voluntarily to the jurisdiction of said Court in any such proceedings."[1] (Emphasis added.)

1. The Supreme Court of the United States has recently recognized the validity of forum-selection clauses in fairly negotiated contracts. See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12, 92 S.Ct. 1907, 1914, 32 L.Ed.2d 513 (1972), where the Court said:

"The choice of that forum was made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts."

In Central Contracting Co. v. Maryland Casualty Co., 367 F.2d 341, 344–45 (3d Cir. 1966), the court said:

"The court there reviewed the earlier Pennsylvania decisions and announced the modern rule which is to prevail in Pennsylvania. 'The modern and correct rule is that, while private parties may not by contract prevent a court from asserting its jurisdiction or change the rules of venue, nevertheless, a court in which venue is proper and which has jurisdiction should decline to proceed with the cause when the parties have freely agreed that litigation shall be conducted in another forum and where such agreement is not unreasonable at the time of litigation.' Central Contracting Co. v. C. E. Youngdahl & Co., Inc., 418 Pa. 122, 133, 209 A.2d 810, 816 (1965). . . .

"We need not consider whether in this diversity case we are bound to apply the Pennsylvania rule, for both federal and state courts have increasingly in recent years recognized the same principle which the Supreme Court of Pennsylvania has now adopted. It is becoming more widely recognized that for reasons of business or convenience the parties may have bargained that all litigation arising out of their complex activity under a contract shall be drawn into one jurisdiction. So long as there is nothing unreasonable in such a provision there is no basis for viewing it as an affront to the judicial power, which must be stricken down. On the contrary, it should be respected as the responsible expression of the intention of the parties so long as there is no proof that its provisions will put one of the parties to an unreasonable disadvantage and thereby subvert the interests of justice.

"The Pennsylvania rule, therefore, represents the correct principle, and we accept it

Moreover, the parties agreed in Paragraph 17 to a mechanism for the resolution of other disputes:

"Except with respect to paragraph 2(g) of the Agreement, *all* disputes, differences, questions of interpretation, questions of construction, disagreements and other problems which may arise in any manner out of this Agreement of the separation of the parties shall be referred to Victor J. Roberts, Esquire, and William L. O'Hey, Jr., Esquire, for decision. If they cannot agree they shall refer the matter to a third person agreeable to them for decision, which shall include the allocation of any costs incurred.

"The parties agree to abide by the decision thus reached . . . ."[2]

The tranquility of separation was short-lived. On March 14, 1969, defendant brought a habeas corpus action in the Montgomery County Court of Common Pleas, contending that his visitation rights had been infringed. A hearing was held on April 3, 1969, and plaintiff submitted herself to the jurisdiction of the Montgomery County Court. By court order of May 19, 1969, defendant was granted specified visitation rights and plaintiff was required to post a $5,000.00 bond upon condition that she not remove the children from the court's jurisdiction without express written approval of the court. The bond was finally posted on June 13, 1969, after defendant had petitioned for a contempt citation against plaintiff. While the case was pending, plaintiff and the children moved to Florida in violation of the court's order.[3] Subsequently, on November 10, 1969, plaintiff was declared in contempt, judgment on the bond was granted, and a bench warrant for plaintiff's arrest, which remains outstanding, was issued.[4] The above-mentioned (1) May 19, 1969, state court order recited that " . . . the mother, Lynne E. Solomon, stated in Court on April 13, 1969, that she submitted to the jurisdiction of the Courts of Montgomery County, Pennsylvania . . . ." (37a), and (2) November 10, 1969, state court order recited that " . . . Lynne E. Solomon having stated at the initial hearing on June 13, 1969, and again on August 8, 1969, and again on August 11, 1969, that she would abide by the jurisdiction of the Montgomery County, Pennsylvania Court . . . ." (40a).[5] Defendant con-

---

and apply it here. This brings us to the question whether the provision that the action must be brought only in the courts of New York County is unreasonable.

"On the face of it there is no unreasonableness in the provision."

Federal district courts sitting in Pennsylvania have held that Pennsylvania would find consent to be a basis for jurisdiction. See AAMCO Automatic Transmissions, Inc. v. Hagenbarth, 296 F.Supp. 1142, 1143 (E.D.Pa.1968); Spatz v. Nascone, 364 F.Supp. 967, 978–81 (W.D.Pa.1973).

2. The agreement was executed in Pennsylvania, where both parties were then domiciled, and, pursuant to Paragraph 27, was to be construed in accordance with the laws of Pennsylvania.

3. Plaintiff had earlier sought revision of the visitation rights. This petition was dismissed on October 6, 1969, following the plaintiff's move to Florida.

4. No appeal was taken from these orders.

5. This November 10, 1969, state court order contains this language, *inter alia* (39a–40a):

"AND NOW, this 10th day of November, 1969, Lynne E. Solomon having been ordered by the Court under date of May 19, 1969 to grant visitation rights to the father, John F. Solomon, Jr., and, having failed to do so, and having been ordered by the Court on August 11, 1969 not to remove the children from the jurisdiction of the Court without the written consent of the Court, and she having deliberately violated that Order, and Lynne E. Solomon having been notified that these proceedings would be held by Rule and Order dated October 29, 1969, which was served upon her specifically in accordance with the Order of the Court and under the terms of that Order, . . . Lynne E. Solomon is declared in contempt and a bench warrant is directed to be issued and executed. Judgment is granted on the bond dated June 13, 1969."

The above language makes clear that the Pennsylvania courts held on the facts of this case that the obligation to grant visitation rights to the husband was not independent of, but was directly connected with, the financial provision in the bond on which judgment was entered.

cedes non-payment of support after November 1969, but contends that he did so only after plaintiff had materially breached the separation agreement by denying his visitation rights.

After plaintiff secured residence in Florida, defendant obtained a divorce decree and remarried.[6] In August 1972, plaintiff and the children moved from Florida to Newark, Delaware. On December 13, 1973, plaintiff filed suit, based upon diversity of citizenship, in the federal district court for the Eastern District of Pennsylvania, seeking money damages for non-support, specific enforcement of the separation agreement, and appropriate equitable relief.[7] This suit was instituted by plaintiff in her representative capacity as parent and natural guardian of the children and in her own right. Defendant submitted alternative motions for summary judgment, dismissal, or a stay of proceedings pending resolution of the litigation in the Montgomery County Court of Common Pleas. The district court granted the motion for summary judgment on the ground that it lacked jurisdiction to adjudicate a cause of action involving "domestic relations."[8] This appeal followed.

II.

Traditionally, the federal courts have evinced great reluctance to entertain cases involving domestic relations. This doctrine is not premised upon explicit statutory language limiting the jurisdictional authority of federal courts. Indeed, the jurisdictional statute utilized by plaintiff to bring suit grants original jurisdiction to federal district courts "in all civil actions"[9] where there is jurisdictional amount and diversity of citizenship.[10] 28 U.S.C. § 1332. Rather, the jurisdictional exception for domestic relations has been judicially carved, beginning with and extending through a se-

---

6. The record does not indicate when the divorce was granted. More importantly, there is no evidence whatsoever that the divorce decree incorporated any portion of the separation agreement. Plaintiff's suit is grounded upon the contractual arrangement.

7. It should be noted that plaintiff had previously instituted two nonsupport proceedings in the Montgomery County Court of Common Pleas. The first, filed March 5, 1970, while plaintiff was residing in Florida, was dismissed because plaintiff was in contempt of court. The second, filed December 3, 1972, after plaintiff moved to Delaware, was continued generally until such time as plaintiff purged herself of contempt. These decisions demonstrate—contrary to the suggestion of the dissenting opinion—that the state court was not prepared to treat the support and visitation actions as wholly distinguishable. Both actions were based upon the Uniform Reciprocal Enforcement of Support Act. 62 P.S. § 2043.1 et seq. We are not called upon to decide whether in these suits, under 62 P.S. § 2043.4, the "duty of support imposed or imposable by law" consisted of the separation agreement, a support obligation under Pennsylvania law and independent of the agreement, or both. Plaintiff was free to appeal the March 5, 1970, dismissal, as well as the finding of contempt, to the Pennsylvania appellate courts.

8. Specifically, the district court concluded (48a): " . . . the present case 'involves domestic relations' and thus is a matter which has been traditionally left by the federal courts to the purview of the state courts."

9. The original diversity statute of 1789 specified "all suits of a civil nature at common law or in equity . . . ." Act of September 24, 1789, § 11, 1 Stat. 73, 78. Various commentators have explained that, initially, the refusal to exercise federal jurisdiction was grounded at least in part upon the rationale that, since domestic relations cases were historically heard in ecclesiastical courts, they did not come within the compass of this provision. See, e. g., Wright, Federal Courts, 2d ed. § 25 at p. 84. This phraseology was maintained (28 U.S.C. § 41(1), 1940 ed.) until 1948, when Congress revised Title 28 of the United States Code, and the phrase "all civil actions" was substituted. Act of June 25, 1948, c. 646, 62 Stat. 930. The Revisor's Notes to 28 U.S.C. § 1332 suggest that the sole purpose of the amendment was to produce conformity with the language of Rule 2 of the Federal Rules of Civil Procedure. The legislative history of the 1948 amendment in no way suggests that this particular change was motivated by a desire to expand or contract the jurisdictional scope of the federal courts. Spindel v. Spindel, 283 F.Supp. 797, at 801 (E.D.N.Y.1968).

10. There is no dispute as to either jurisdictional amount or diversity of citizenship in this case.

ries of dicta in decisions of the United States Supreme Court.

In Barber v. Barber, 62 U.S. (21 How.) 582, 16 L.Ed. 226 (1859), the Court entertained a suit filed in federal court in Wisconsin by a wife residing in New York against her husband, who lived in Wisconsin. Her suit sought to enforce a decree of the New York state courts which granted her separation and alimony. Although ruling that the district court had properly exercised jurisdiction, the Court commented:

"Our first remark is—and we wish it to be remembered—that this is not a suit asking the court for the allowance of alimony. That has been done by a court of competent jurisdiction. The court in Wisconsin was asked to interfere to prevent that decree from being defeated by fraud.

"We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony or as an incident to divorce a vinculo, or to one from bed and board."

62 U.S. at 584.

Chief Justice Taney and Justices Daniel and Campbell remained unplacated by this caveat and dissented, arguing that the federal courts had absolutely no jurisdiction over the subjects of divorce and alimony.

In re Burrus, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500 (1890), involved a dispute over child custody in which the child's father had applied in the federal district court of Nebraska for a writ of habeas corpus to recover the child from the care of her grandparents. The district court granted the writ and, when the grandfather refused to relinquish the child, cited him for contempt and committed him to jail. The grandfather petitioned directly to the Supreme Court for a writ of habeas corpus, contending that he was illegally imprisoned because the district court had erred in assuming jurisdiction of the father's custody case. The Supreme Court agreed, explaining that federal courts have no jurisdiction over child custody suits. It emphasized:

"The whole subject of the *domestic relations of husband and wife, parent and child*, belongs to the laws of the states, and not to the laws of the United States." (Emphasis added.)

136 U.S. at 593–94, 10 S.Ct. at 853.

In Simms v. Simms, 175 U.S. 162, 20 S.Ct. 58, 44 L.Ed. 115 (1899), the Court heard an appeal from a divorce decree and alimony award which had been affirmed by the territorial Supreme Court of Arizona. It concluded that the jurisdictionally restrictive dictum of *Barber* was not applicable to the jurisdiction of territorial courts or to the United States Supreme Court's appellate jurisdiction over those courts. The only statutory restriction upon appeals from the territorial Supreme Courts to the United States Supreme Court was that the matter in dispute exceed $5,000.00. In holding that the alimony award, but not the divorce decree, met that requirement, the Court remarked:

"It may therefore be assumed as indubitable that the Circuit Courts of the United States have no jurisdiction, either of suits for divorce, or of claims for alimony, whether made in a suit for divorce, or by an original proceeding in equity, before a decree for such alimony in a state court. Within the States of the Union, the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the State, and not to the laws of the United States. In re Burrus, 136 U.S. 586, 593, 594 [10 S.Ct. 850, 34 L.Ed. 500, 503]."

175 U.S. at 167, 20 S.Ct. at 60.

The territorial jurisdiction exception to the broad prohibition against domestic relations suits in federal courts arose again in De La Rama v. De La Rama, 201 U.S. 303, 26 S.Ct. 485, 50 L.Ed. 765 (1906). In that case, the Supreme Court of the Philippine Islands reversed a divorce decree and alimony and allowance awards granted by the trial court. Cit-

ing *Simms*, the Court concluded that it had jurisdiction to hear the appeal:[11]

> "It has been a long-established rule that the courts of the United States have no jurisdiction upon the subject of divorce, or for the allowance of alimony, either as an original proceeding in chancery, or an incident of a divorce or separation, both by reason of the fact that the husband and wife cannot usually be citizens of different states so long as the marriage relation continues (a rule which has been somewhat relaxed in recent cases), and for the further reason that a suit for divorce in itself involves no pecuniary value. . . .
>
> "But the general rule above stated has no application to the jurisdiction of the territorial courts, or of the appellate jurisdiction of this court over those courts."

201 U.S. at 307–08, 26 S.Ct. at 486. The judgment of the Supreme Court of the Philippine Islands was reversed with Justices Holmes, Peckham, White and Day dissenting on the jurisdictional question.

A unanimous court reaffirmed the primacy of state courts in domestic relations suits in a non-diversity setting in Ohio ex rel. Popovici v. Agler, 280 U.S. 379, 50 S.Ct. 154, 74 L.Ed. 489 (1930). Relator, Vice-Consul of Roumania, had married a resident of Ohio who later sued him for divorce and alimony in the state courts of Ohio. The Ohio state trial court granted temporary alimony over relator's objection that it lacked jurisdiction. His petition for writ of prohibition was denied by the Supreme Court of Ohio, and the United States Supreme Court granted certiorari to consider relator's argument that, under Article III, Section 2, of the Constitution,[12] the Supreme Court had original jurisdiction. Explaining the earlier domestic relations cases and noting that the parties' suit for divorce in a federal district court had been dismissed earlier, Justice Holmes' opinion, affirming the Ohio courts, reasoned:

> "The words quoted from the Constitution do not of themselves and without more exclude the jurisdiction of the State. . . . The statutes do not purport to exclude the State Courts from jurisdiction except where they grant it to the Courts of the United States. Therefore they do not affect the present case if it be true as has been unquestioned for three-quarters of a century that the Courts of the United States have no jurisdiction over divorce. If when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States, there is no difficulty in construing the instrument accordingly and not much in dealing with the statutes."

11. Unlike *Simms*, the Court proceeded to consider the divorce decree as well as the alimony award. It explained:

"While, as indicated in Simms v. Simms, the decree for alimony, although in one sense an incident to the suit for divorce, is a distinct and final judgment for a sum of money, and is therefore a good ground for an appeal from that part of the decree, yet, where the appeal is from the whole decree (as in this case), or even from a part of the decree, and the denial of alimony or separation of the conjugal property depends upon the evidence which bears upon the right to a divorce, we cannot determine that question without passing upon the sufficiency of the testimony authorizing or refusing the divorce. An appeal from the decree for alimony or other property right would be of no value whatever unless the facts connected with the allowance or refusal of such right were open to review in the appellate court. Although an appeal from a part of a decree does not bring up the part not appealed from, yet, if the whole decree, must be reviewed in order to decide the appeal, such an appeal brings up the entire record. . . The case is even stronger where the appeal is taken from the whole decree." (Citations omitted.)
201 U.S. at 310, 26 S.Ct. at 487.

12. Article III, Section 2, reads in pertinent part:

"In all Cases affecting Ambassadors, other public Ministers and Consuls . . . the supreme Court shall have original Jurisdiction."

280 U.S. at 383–84, 50 S.Ct. at 155.

■■■ Our understanding of these cases requires us to conclude that the district court properly refused to exercise jurisdiction over the instant case. The import of the Supreme Court's language in these cases is that the federal courts do not have jurisdiction in domestic relations suits *except* where necessary to the effectuation of prior state court judgments involving the same matters [13] or where jurisdiction lies by dint of the participation and review of territorial courts.[14] The case at bar cannot be categorized into either narrow exception. In fact, assumption of jurisdiction in this case would, as the district court recognized, have precisely the opposite effect since it would undermine and derogate both the state court's contempt citation against plaintiff and its decision to continue generally her support action until

13. Barber v. Barber, *supra*. See, e. g., Cain v. King, 313 F.Supp. 10, 16 (E.D.La.1970) (merger of separation agreement into divorce decree). The Full Faith and Credit Clause (Article IV, Section 1, of the Constitution) requires that the domestic relations decrees of the courts of one state be given proper recognition in other states. See Sutton v. Leib, 342 U.S. 402, 72 S.Ct. 398, 96 L.Ed. 448 (1952); Williams v. North Carolina, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945); Williams v. North Carolina, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942). In the second *Williams* case, the Court said at 237 of 325 U.S., at 1098 of 65 S.Ct.: " . . . in [the] federal system . . . [the] regulation of domestic relations has been left with the States and not given to the national authority. . . ."

14. De La Rama v. De La Rama, *supra*; Simms v. Simms, *supra*.

15. We reiterate that plaintiff did not appeal either of these decisions in the state courts of Pennsylvania.

16. We cannot agree with any language in Richie v. Richie, 186 F.Supp. 592, 594 (E.D.N.Y. 1960), and Manary v. Manary, 151 F.Supp. 446, 447, 449 (N.D.Cal.1957), which implies that a divorce decree *ipso facto* terminates domestic relations and grants jurisdiction to federal courts on any issue arising from the marital relationship. In our view, the district court's assertion of jurisdiction in *Richie* was amply warranted by the fact that plaintiff's action sought to recover upon a valid state judgment in Washington based upon an earlier divorce decree, granted in Texas, which incorporated a separation agreement. Conversely,

such time as plaintiff purged herself of contempt.[15]

■■■ Nor do we accept plaintiff's contention that a divorce decree *without more* removes this case from the arena of domestic relations and permits the intervention of federal courts to adjudicate issues unaffected by that decree.[16] At the core of both parties' contentions is the parent-child relationship. The divorce decree in this case did not sever that relationship. There is no evidence that it either incorporated the terms of the separation agreement or merged with it. The state courts have not rendered any judgment on support payments which requires our invocation of jurisdiction to assure its efficacy. In Albanese v. Richter, 161 F.2d 688, 689 (3d Cir. 1947), we disclaimed jurisdiction over the suit of an illegitimate child against his putative father for support and education.[17] That case made clear

the dismissal of the action in *Manary* was proper since the plaintiff, after the decree of divorce, sought to overturn portions of the property settlement incorporated into that decree.

17. We cannot agree with the dissenting opinion that the *Albanese* case has been "overruled" by Carr v. Wisecup, 263 F.2d 157 (3d Cir. 1959), which did not cite or discuss a single case involving the principle stated repeatedly by the Supreme Court of the United States since Barber v. Barber, *supra* (1859), that the courts of the United States have no jurisdiction over domestic relations matters. The issue concerning the limitation of federal jurisdiction in domestic relations matters was not raised in any of the briefs filed in this court in the *Carr* case. Also the *Carr* decision was not an en banc decision. Furthermore, in 1972, thirteen years after, on the dissent's interpretation, *Carr* had overruled *Albanese, Albanese* was cited with approval by this court. In Magaziner v. Montemuro, 468 F.2d 782, 787 (3d Cir. 1972), the court used this language:

"Traditionally, it has been the policy of federal courts to avoid assumption of jurisdiction in this species of litigation. 'The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states and not to the laws of United States.' In re Burrus, 136 U.S. 586, 593–594, 10 S.Ct. 850, 853, 34 L.Ed. 500 (1890). Indeed, this court has explicitly held there is no federal diversity jurisdiction in a domestic relations case involving a child. Albanese v. Richter, 161 F.2d 688 (3d Cir. 1947)."

the fact that the classification of a suit as one in domestic relations does not depend upon the existence, and impliedly the continuation, of a marriage relationship.[18]

In holding that the domestic relations doctrine applies to the case before us, we do not mean to suggest that a separation agreement may never be litigated in the federal courts by parties between whom there is diversity of citizenship. In a different case, in which the custody of no child was involved, in which there was neither pending state court action nor an agreement to litigate in the state courts, and in which there was no threat that a feuding couple would play one court system off against the other, we might well assume jurisdiction. But all the above dangers are involved in the present case and lead us to the conclusion that the domestic relations doctrine should apply. See In re Burrus, *supra.*

The domestic relations exception to the jurisdictional powers of federal courts represents an historically engrained limitation upon us. It is true that the rationale upon which it is premised has shifted from conceptions regarding the powers of ancient ecclesiastical courts, see note 8, *supra,* the non-diversity of married couples, and the lack of monetary value of a divorce, see *De La Rama, supra,* to the modern view that state courts have historically decided these matters and have developed both a well-known expertise in these cases and a strong interest in disposing of them. See C. Wright, Handbook of the Law of Federal Courts 84 (2d ed. 1970). In Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel, 490 F.2d 509 (2d Cir. 1973), Judge Friendly used this language at pages 514 and 515, after quoting from Barber v. Barber, *supra,* the wording set forth above at page 1022 of this opinion:

"Mr. Justice Holmes . . . continued [280 U.S.] at 383–384, 50 S.Ct. at 155:

> Therefore, they do not affect the present case if it be true as has been unquestioned for three-quarters of a century that the Courts of the United States have no jurisdiction over divorce. If when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States, there is no difficulty in construing the instrument accordingly, and not much in dealing with the statutes. . . .

"We have no disposition to question that conclusion, whether the history was right or not, cf. Spindel v. Spindel, *supra,* 283 F.Supp. at 802–803. More than a century has elapsed since the ·Barber dictum without any intimation of Congressional dissatisfaction. It is beyond the realm of reasonable belief that, in these days of congested dockets, Congress would wish the federal courts to seek to regain territory, even if the cession of 1859 was unjustified. Whatever Article III may or may not permit, *we thus accept the Barber dictum as a correct interpretation of the Congressional grant.*

. . . . .

"The holding that, with one possible exception, federal jurisdiction was not barred by the dictum in Barber v. Barber, *supra,* 62 U.S. (21 How.) at 584, 16 L.Ed. 226, does not necessarily entail a conclusion that the district court should have adjudicated this action. It would be difficult to think of a case where invocation of federal jurisdiction by a plaintiff was less justified than here; indeed, anyone challenged to produce an example why diversity jurisdiction should be abolished or se-

---

**18.** While separation or property agreements between spouses will normally be treated as enforceable contracts, it is generally recognized that these agreements will not be enforced if they encourage divorce. See, *e. g.,* Miller v. Miller, 284 Pa. 414, 131 A. 236 (1925).

*See generally* Clark, Domestic Relations, § 16.1 at p. 521. We refuse to provide that incentive, however slight, by a ruling the effect of which is incongruous with the purposes of and limitations on a separation agreement.

verely curtailed would hardly have conceived so dramatic an illustration. . . . Most important of all, decision requires exploration of a difficult field of New York law with which, because of its proximity to the exception for matrimonial actions, federal judges are more than ordinarily unfamiliar."

(Emphasis supplied.)

In concluding his opinion, Judge Friendly made this comment at page 521:

"If our decision here has inadvertently rent a seam in New York matrimonial law, we trust the New York courts will speedily repair it in some other case. The injury was not of our making."

Concededly, this judge-made doctrine is not without its critics.[19] But until such time as either Congress or the Supreme Court sees fit to amend or emasculate this exception, we are bound by the precedent of the Supreme Court's language and the weight of federal authority [20] to apply it to the broad area of domestic relations. Its application in this case preserves the sanctity of state court judgments and protects against confusing and complicated piecemeal litigation. Although plaintiff repeatedly stated in open court that she "submitted to the jurisdiction of the" state court, as noted at page 1020 above, she seeks to have the federal court nullify its rulings in this action.

The district court was justified in concluding that it lacked jurisdiction of this case.

## III.

Our ruling that plaintiff cannot resort to the federal judiciary is bottomed upon the domestic relations doctrine. Its application in this case, we believe, produces a result consistent with the federal appellate court cases. In addition, review of the terms of this particular separation agreement, without the necessity of interpreting their legal ramifications, and the declarations of plaintiff to the state courts, buttresses the district court conclusion that the federal courts have no jurisdictional authority to decide the merits of this case.

 The basis of plaintiff's suit in contract is the contention that defendant violated their separation agreement by his failure to pay support. Defendant, in turn, concedes that he terminated payments but argues that he was legally justified in doing so because plaintiff's denial of his visitation rights represented an earlier material breach of contract which voided the entire agreement, including the terms relating to support. Simply stated, defendant's contractual liability is contingent upon a determination of whether he was denied a contractual right and, if so, whether that denial was a material breach of the separation agreement.[21] That determination requires a consideration of a dispute as to visitation rights—an area where the parties agreed, under paragraph 2(g) of the separation agreement, to submit to the jurisdiction and decision of the Montgomery County Court of Common Pleas.[22]

**19.** See, e. g., Spindel v. Spindel, 283 F.Supp. 797 (E.D.N.Y.1968). *See generally* Vestal & Foster, Implied Limitations on the Diversity Jurisdiction of Federal Courts, 41 Minn.L.Rev. 1, at 25 (1956). It is noteworthy, however, that when the Supreme Court created or enforced even the two narrow exceptions to the rule against federal jurisdiction in domestic relations cases, the majority of the Court. encountered stiff opposition from justices who believed that there was no jurisdiction in the federal courts over these cases. De La Rama v. De La Rama, *supra*; Barber v. Barber, *supra*. Unanimity occurred when the Court refused jurisdiction. Ohio ex rel. Popovici v. Agler, *supra*.

**20.** See, e. g., Hernstadt v. Hernstadt, 373 F.2d 316, 317–18 (2d Cir. 1967) (custody and visitation rights); Blank v. Blank, 320 F.Supp. 1389, 1391 (W.D.Pa.1971) (divorce action remanded to state court); Linscott v. Linscott, 98 F.Supp. 802, 804–05 (S.D. Iowa 1951) (property settlement agreement).

**21.** The question of defendant's liability for support payments under the contract is, of course, an entirely separate one from that of his liability for support payments under Pennsylvania law.

**22.** The authorities explain that, generally, contractual agreements to limit the jurisdiction of

## IV.

■ Under Rule 12(h)(3) of the Federal Rules of Civil Procedure (28 U.S.C.), lack of subject matter jurisdiction should be raised and adjudicated by a motion to dismiss, not a motion for summary judgment. See, *e. g.*, Jones v. Brush, 143 F.2d 733, 735 (9th Cir. 1944); Safeguard Mutual Insurance Co. v. Commonwealth of Pennsylvania, 372 F.Supp. 939, 946 (E.D.Pa.1974). Accordingly, the district court's order of summary judgment in favor of defendant will ·be reversed and the case will be remanded with instructions to enter judgment dismissing the action for want of subject matter jurisdiction. Costs will be taxed against appellants.

GIBBONS, Circuit Judge (dissenting):

This is a diversity contract action. The plaintiff Solomon, a Delaware resident, sues in two capacities; as guardian of three infants, and on her own behalf. Her claim, which principally seeks money, meets the jurisdictional amount requirement of 28 U.S.C. § 1332. It alleges that the defendant, a Pennsylvania resident, defaulted on installments due under a written agreement dated November 22, 1968. The defendant's answer admits the execution of the agreement, denies the default, and pleads certain affirmative defenses including the pendency of litigation over the same controversy in the Court of Common Pleas of Montgomery County, Pennsylvania,

unclean hands, laches, and a material breach of the agreement which excuses defendant's performance. Defendant also asserts a counterclaim, for, among other things, an indebtedness on a judgment, and a breach of article 4 of the agreement with respect to securities and funds held for the benefit of the children. By way of relief, the counterclaim seeks, among other things (1) a declaration that defendant's performance be excused; (2) an accounting for securities and funds held for the benefit of the children; (3) enforcement of payment on the judgment; (4) a set-off for any sums due under the agreement by reason of plaintiff's breach, and (5) specific enforcement of the visitation provisions of the agreement. The answer pleads affirmatively that "The Court lacks jurisdiction over the subject matter," but does not state why this is so. An answer to the counterclaim puts in issue all its material allegations.

The defendant moved for summary judgment, and alternatively for a dismissal pursuant to Rule 12(b), Fed.R. Civ.P. because the court lacked subject matter jurisdiction. The Rule 56 motion was on the ground that the plaintiff, by reason of her default under the provisions of the November 22, 1968 agreement, and her alleged contempt of an order of the Montgomery County court, was barred by unclean hands from obtaining enforcement of the property and money provisions of the agreement. The

---

courts are not effective to deprive any court of jurisdiction which it would otherwise have unless the provision is justice-promoting, represents a fair compromise after the dispute has arisen, or is tailored to the convenience of the parties. In this case, as we have held, federal courts would *not* have had jurisdiction. Whether or not paragraph 2(g) is effective to deprive other courts of jurisdiction is a question which we need not reach.

Paragraph 17 of the separation agreement mandated that all disputes, other than those relating to visitation rights, were to be resolved by an arbitration-like procedure. Whether this arbitration clause would serve to deprive us of jurisdiction in the circumstances of this case is a question which we need not decide. It is clear that Pennsylvania courts do

not allow arbitration clauses to deprive them of jurisdiction. Central Contracting Co. v. C. E. Youngdahl & Co., 418 Pa. 122, 209 A.2d 810 (1965); Mixer, Inc. v. Smith, 229 Pa.Super. 273, 323 A.2d 794 (1974). Though we need not consider the enforceability of this clause, we feel compelled to state that there is no evidence in the record before us that the parties utilized this mechanism in an attempt to resolve their dispute on support payments. *See generally* 6A Corbin on Contracts, §§ 1432, 1433 and 1445 (1951, Supp.1962); Restatement of Contracts (ALI), §§ 550 and 558 (1932, Supps.1948, 1954, 1965, 1972–73); 6 Williston on Contracts, § 1725 (1938 Revised Ed., Supp.1972). See also Furbee v. Vantage Press, Inc., 150 U.S.App.D.C. 326, 464 F.2d 835, 837 (1972).

only ground for the claimed lack of subject matter jurisdiction in defendant's motion was based upon the pendency of litigation in the Montgomery County court. The docket entries attached as Exhibit B to defendant's affidavit suggest that the state court action is no longer pending, and plaintiff's attorney so urged in his brief in the district court. In any event, the pendency of a state court proceeding would not deprive the district court of jurisdiction. Stanton v. Embrey, 93 U.S. 548, 23 L.Ed. 983 (1877); 1A J. Moore, Federal Practice § 0.221 (2d ed. 1974).

In support of his motion for summary judgment, the defendant filed an affidavit which attached the November 22, 1968 agreement as an exhibit. The affidavit averred that defendant commenced a state habeas corpus proceeding in the Court of Common Pleas of Montgomery County, Pennsylvania in 1969 to counter an alleged breach of the agreement by the plaintiff. The defendant accused plaintiff of precipitating the state proceeding by denying him his visitation rights and by threatening to move to another state in order to deny him these rights. He attached copies of the docket entries in the Montgomery County case, and alleged that plaintiff is in contempt of the order of that court. Plaintiff filed an answering affidavit in which she alleged that at all times while she was living out of Pennsylvania defendant was advised that he could visit the children at plaintiff's residence. The agreement, Exhibit A to the affidavit, stipulates that plaintiff has custody of the children and that defendant may visit them at her residence. It also provides:

"Wife shall promptly notify Husband of any change of address of her residence while any of the Children are in her custody and, in order that Husband's rights of visitation may not be rendered practically ineffective, Wife agrees that in the event she may cause Children's residence to be more than 50 air miles distant from Norristown, Pennsylvania, she shall give Husband at least two month's advance written notice of same and, in the event that the parties cannot resolve the issue of Husband's future visitation rights between themselves, they hereby agree to submit any dispute for resolution in the Court of Common Pleas of Montgomery County, Pennsylvania. Both parties herewith agree to submit voluntarily to the jurisdiction of said Court in any such proceedings." (Appendix at 16a).

The defendant's papers suggest that the habeas corpus proceeding was instituted pursuant to this selection of jurisdiction clause. They do not, however, plead that the habeas corpus case bars relief on a collateral estoppel or res judicata basis. The answer to the counterclaim asserts that plaintiff was not adequately served with process as required by due process of law and the record does not conclusively establish that she was.

What is clear on the face of the November 22, 1968 agreement, however, is that article 2, dealing with custody and visitation, in which the selection of jurisdiction clause quoted above appears, is *entirely severable* from the balance of the agreement. The only matter referred to the Court of Common Pleas of Montgomery County is the possible modification of the defendant's visitation rights in the event the wife moves more than fifty air miles from Norristown, Pennsylvania.[1] Article 11 provides for a confession of judgment by any court of record within the United States or elsewhere for any delinquency, deficiency or arrearage in any payments called for in the agreement, and it contains no express exception with respect to payments withheld because of disputes over visitation. Article 17 provides that "all disputes, differences, questions of interpretation, questions of construction, disagreements and other problems" except those dealing with paragraph 2(g), the

---

1. The record does not establish the air mile distance between Norristown, Pennsylvania and Newark, Delaware, where plaintiff and the children now reside.

custody provision, shall be arbitrated by designated arbitrators. An obvious ambiguity is created by the dual existence of an arbitration clause and a confession of judgment clause which, by virtue of the choice of law clause in article 27 must be resolved in accordance with the laws of Pennsylvania. But it is perfectly clear that these provisions, and not paragraph 2(g), govern the defendant's monetary obligations. Thus, it cannot be said, as the majority suggests, although does not decide, that paragraph 2(g) works an ouster of jurisdiction on the district court.

If we consider the merits of the defendant's asserted defense that plaintiff has materially breached the agreement, the document makes clear that the article dealing with visitation and the one dealing with support are independent and not dependent. Thus the defense is unavailable to defendant. In Moore v. Moore, 38 Pa.D. & C.2d 10 (Phila. County Ct. 1965) the court was called upon to interpret an agreement similar to the one before us. The defendant had defaulted in making support payments to his wife on the ground that she had breached a non-molestation covenant in the agreement. Just as the agreement before us does not condition payment on visitation, the agreement in *Moore* contained no language conditioning payment on non-molestation. The court held that the covenants were independent. It refused to find dependence as a result of a boiler plate recital, a recital quite similar to the one in our agreement.[2] Moreover, it is extremely likely that the Pennsylvania courts would hold, as a matter of law, that the breach of a covenant granting visitation rights is not a defense to an action for arrearages when the support provisions of the agreement

are so obviously designed to aid the husband in discharging his legal duty to support his children. *See* Mallinger v. Mallinger, 197 Pa.Super. 34, 175 A.2d 890 (1961); Comment, Selected Aspects of Domestic Relations in Pennsylvania, 15 Vill.L.Rev. 120, 131 (1969).

The trial court recognized that as the issues were framed by the affidavits summary judgment either on the unclean hands theory or because of the pendency of the state court action would not be proper. The majority opinion reaches the same conclusion. But the district court went on to decide on a ground never actually urged by either party:

"While we do not agree with either of defendant's assertions, we do feel that the present case 'involves domestic relations' and thus is a matter which has been traditionally left by the federal courts to the purview of the state court. . . ." Solomon v. Solomon, 373 F.Supp. 1036, 1037 (E.D. Pa.1974).

The majority opinion accepts this proposition with the sole qualification that there should have been a dismissal for want of subject matter jurisdiction rather than a summary judgment. Thus the majority holding is that the assertion in a simple diversity contract action of a probably groundless defense based on a clearly severable part of a complex agreement is enough to deprive the diversity court of subject matter jurisdiction because the suit "involves domestic relations." The majority opinion says:

"Simply stated, defendant's contractual liability is contingent upon a determination of whether he was denied a contractual right and, if so, whether that denial was a material breach of the separation agreement. That de-

---

**2.** The recital in *Moore*, read:

" 'Now therefore, in consideration of the promises and of the mutual covenants and undertakings of the parties hereto, and intending to be legally bound hereby, the parties mutually promise and agree'." 38 D. & C.2d at 17.

The recital in the agreement involved in the case *sub judice* reads:

"NOW THEREFORE, in consideration of the premises and of the mutual promises herein contained, each of the parties hereto, intending to be legally bound hereby, covenants and agrees as follows:" (Appendix at 13a).

termination requires a consideration of a dispute as to visitation rights—an area where the parties agreed, under paragraph 2(g) of the separation agreement, to submit to the jurisdiction and decision of the Montgomery County Court of Common Pleas." (footnote omitted)

Simply stated, the majority misreads the pleadings and the contract. The parties inserted a choice of forum clause in paragraph 2(g) which on its face deals with a single narrow issue. The defendant is attempting to defeat federal jurisdiction by importing into this suit a matter which on the face of the agreement is entirely severable from the financial dispute.

There is nothing "domestic" about the financial dispute. What defendant appears to be interested in primarily is in rewriting the agreement so as to use the severable provision with respect to visitation as a defense to the suit for the support payments which an affidavit concedes he has withheld since 1969. The district court needs only to look at the face of the agreement to conclude that article 2 is severable. If it is, there will be no adjudication of visitation rights, with respect to plaintiff's claim, but only a judgment requiring the husband to pay, subject to any appropriate set-off. If, as seems highly unlikely, the court concludes that paragraph 2(g) is not severable, it still will not be called upon to adjudicate visitation rights. It will merely decide that the choice of forum clause is enforceable and dismiss the complaint on the merits on that ground. Thus the "domestic relations" issue is in this case a phantasm.

But more to the point, there is no well-established domestic relations exception to our subject matter jurisdiction as is announced so confidently by the majority. Rather there is a collection of misstatements of ancient holdings and of ill-considered dicta. I think that the myth of a broad exception to the judicial power of the United States with respect to questions of "domestic relations" was exposed completely and finally by Judge Weinstein's opinion in Spindel v. Spindel, 283 F.Supp. 797 (E.D.N.Y.1968). If that historical review was not sufficient, Judge Friendly's opinion in Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel, 490 F.2d 509 (2d Cir. 1973) should have nailed the lid on the coffin. But the majority opinion proposes to give new currency to a hoary heresy. Spindel v. Spindel, *supra*, holds that there is diversity jurisdiction over a suit seeking damages because the defendant fraudulently induced the plaintiff to marry him and then fraudulently procured a Mexican divorce. Judge Weinstein discussed, and I suggest effectively explained, the sources of confusion arising from misapplication of dicta in cases such as Barber v. Barber, 62 U.S. (21 How.) 582, 16 L.Ed. 226 (1859), and In re Burrus, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500 (1890). He concluded that there was no bar to adjudications by the federal courts of the status of persons, even married or formerly married persons. Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel, *supra*, holds that there is diversity jurisdiction to entertain a suit by a New York law firm to recover attorneys fees purportedly authorized by New York law as necessaries for defending a wife in an annulment suit by the husband. Judge Friendly discusses the same group of cases and reaches the same conclusion as did Judge Weinstein in Spindel v. Spindel. He suggests that if there is anything at all to the rule that diversity jurisdiction does not extend to domestic relations matters it narrows down to the possibility, though not the certainty, that a diversity court may not grant a divorce.[3] No useful purpose

---

**3.** The proposition that a diversity court may not grant a divorce, Judge Friendly explains, may be traced to Ohio ex rel. Popovici v. Agler, 280 U.S. 379, 50 S.Ct. 154, 74 L.Ed. 489 (1929). Dictum so suggesting appears in that case, but the holding is no more than that the courts of Ohio did have jurisdiction to hear a divorce case involving a consul despite the provisions of the Judicial Code dealing with jurisdiction in suits against consuls. See 28 U.S.C. §§ 1251, 1351. Popovici v. Agler as a matter of statutory interpretation is unexcep-

would be served by repeating the arguments set forth by Judges Friendly and Weinstein in these two well-researched and well-reasoned opinions. Judges Friendly and Weinstein say it as well as it need be said. They make clear that it simply has never been the law that because the dispute is between a present or former husband and wife and involves the marital status it is nonjusticiable in a federal district court. *See also* Vestal & Foster, Implied Limitations on the Diversity Jurisdiction of the Federal Courts, 41 Minn.L.Rev. 1, 29–31 (1956). I will only add that the holding in Barber v. Barber, *supra*, compels the conclusion that there is diversity subject matter jurisdiction in this case, since the court there enforced the financial provisions of a separation decree.

Any doubt that there is no matrimonial status exception to diversity subject matter jurisdiction is for this circuit resolved by Judge Hastie's opinion in Carr v. Wisecup, 263 F.2d 157 (3d Cir. 1959). In that case, as here, Pennsylvania residents contemplating divorce executed a separation agreement providing for continuing monthly payments by the husband to the wife for her support and for the support of their two minor children. The wife, as here, moved from Pennsylvania, thus creating diversity of citizenship. She sued in the district court to enforce the agreement and recovered a judgment. On appeal the former husband contended that in the district court he should have been permitted to offer evidence, in opposition to part of the amount awarded, since unknown to him the marriage was bigamous because of plaintiff's undissolved prior marriage. This court reversed and remanded. Judge Hastie wrote:

> "Thus, we have a husband, in contemplation of divorce, agreeing that his children shall be entrusted to the custody of their mother and that he will pay substantial sums monthly towards the support of that household.

The essential basis of such an agreement is the existence of a lawful marriage and its purpose is to discharge obligations which that status imposes. If the 'wife' has concealed an undissolved prior marriage there is no duty to support her and there may well be an unwillingness to entrust her with the custody of the children and the administration of funds for their support. Indeed it is hard to conceive of anything calculated more radically to affect the negotiation of a separation agreement than the discovery by one spouse that the other has knowingly committed bigamy. Therefore, the concealment of an undissolved prior marriage would provide the clearest legal basis for the invalidation of a separation agreement." 263 F.2d at 159.

The dispute in Carr v. Wisecup was just about as "domestic" as a dispute ever could be, and the holding of the case would have to be overruled if we accept the majority's position. In this circuit there is no matrimonial status exception to diversity jurisdiction.

Besides the matrimonial status cases there is another group of cases which are sometimes cited for the proposition that the federal courts may not adjudicate questions relating to subjects touching on domestic relations, including child custody. The case most frequently cited for the proposition that the federal courts are without subject matter jurisdiction to decide child custody cases, and the only Supreme Court opinion so cited, is In re Burrus, 136 U.S. 586, 593–9, 10 S.Ct. 850, 34 L.Ed. 500 (1890). But *Burrus* stands for no such proposition, and the occasional reference to it by secondary authorities, and even cases, for that proposition, displays a propensity for reliance on headnotes. The headnote writer for the October term 1889 summarized the case thus:

> "A District Court of the United States has no authority in law to issue a writ

---

tional. Congress could have made federal jurisdiction exclusive over any dispute to which a consul was a party. The case holds that it

did not. But the fact that the Ohio court had jurisdiction tells us nothing about the presence or absence of federal district court jurisdiction.

of *habeas corpus* to restore an infant to the custody of its father, when unlawfully detained by its grand-parents." 136 U.S. at 586.

The headnote would have been more or less accurate if the reporter had added: "; but a Circuit Court may have."

An understanding of *Burrus* requires an appreciation that in 1889 the old district courts did not have jurisdiction in diversity. That jurisdiction was still, as it had been since 1789, vested in the old circuit courts. In *Burrus*, a case involving diversity of citizenship between father, and grandparents, a district court judge issued a writ of habeas corpus directing the grandparents to surrender custody of the father's child. The grandparents defied the writ and the grandfather was committed to the custody of the United States Marshal for contempt. In the exercise of its appellate jurisdiction the Supreme Court, in an original habeas corpus proceeding, ordered the grandfather's release because the district court did not have jurisdiction to issue the writ of habeas corpus. Two arguments were made for district court jurisdiction. One was based on the habeas corpus statute, but that statute did not then, and does not now, refer to detentions by private parties unless the detention violates some federal law. The other was that the All Writs Statute, § 14 of the Judiciary Act of 1789, gave the district court power to issue a writ of habeas corpus in aid of its jurisdiction. The difficulty in *Burrus* was that the district court did not yet have jurisdiction over diversity cases and there was no federal question. Thus the court held that the district court lacked jurisdiction to issue the writ. But it said:

> "Whatever, therefore, may be held to be the powers of the circuit courts in cases of this kind, where necessary citizenship exists between the contestants, which gives the court jurisdiction of all matters between such parties, both in law and equity, where the

matter exceeds $2,000 in value, we know of no statute, no provision of law, no authority intended to be conferred upon the district court of the United States to take cognizance of a case of this kind, either on the ground of citizenship, or on any other ground found in this case."

136 U.S. at 597, 10 S.Ct. at 854.

If there is dicta in the quotation, it is dicta that an old circuit court could, in a diversity case, adjudicate a child custody question which arose in a diversity case in law or in equity.

This brings me to the "law or equity" qualification, heavily emphasized in much of the literature and case law. *See* Spindel v. Spindel, 283 F.Supp. 797 (E.D.N.Y.1968). This limitation was purely statutory, since § 11 of the Judiciary Act of 1789 gave the circuit courts jurisdiction "of all suits of a civil nature at common law or in equity," while Article III, § 2 of the constitution unqualifiedly extends the judicial power of the United States "—to Controversies . . . between citizens of different States." The § 11 jurisdiction now found in 28 U.S.C. § 1332 has removed the "law and equity" qualification by adopting the language "all civil actions," which would appear to make the diversity subject matter jurisdiction as broad as the text of article III, § 2. At one time Chief Justice Taney attempted, in a concurring opinion, to construct a theory that the "law and equity" language in the clause of article III, § 2 referring to federal question jurisdiction modified the whole section. Fontain v. Ravenel, 58 U.S. (17 How.) 369, 391, 15 L.Ed. 80 (1854).[4] This would have constitutionally excluded district courts, according to Taney, from the exercise of any jurisdiction that was not exercised by the common law courts or the chancellor in 1789. The difficulty with his analysis is that it ignores the text and punctuation of Article III, § 2. Certainly there is nothing in either the constitution or the present diversity statute suggesting an incapacity to adjudi-

---

4. The case involved a Pennsylvania will construction not a domestic relations dispute.

cate an issue of child custody. A fortiori, child visitation can be adjudicated. Moreover, even on Taney's erroneous reading of article III there would be jurisdiction to adjudicate child visitation rights as part of a defense in a case at law or in equity involving an alleged breach of contract.

This then brings us to the often criticized[5] and wholly unanalytical case of Albanese v. Richter, 161 F.2d 688 (3d Cir. 1947). That was a diversity suit by an illegitimate child to set aside an instrument signed by his mother allegedly in fraud of his rights, and to enforce New York and New Jersey statutes which require putative fathers to support and educate their illegitimate offspring. In the district court Judge Guy L. Fake pointed out that at common law the putative father was under no obligation to support an illegitimate child. Albanese v. Richter, 67 F.Supp. 771, 772 (D.N.J.1946). Since the statutory obligation was not one which would have been enforced by the common law or chancery courts in England, he concluded, relying on Taney's faulty thesis in Fontain v. Ravenel, *supra*, that there was no jurisdiction to enforce the New York or New Jersey statutory duties. On appeal this court affirmed. Its analysis, or lack thereof, consists of the following paragraph:

"Mere diversity of citizenship and jurisdictional amount, in and of themselves, are not sufficient to give jurisdiction to federal courts. 28 U.S.C.A. § 41(1), as interpreted by the courts, has been held consistently not to include suits primarily involving domestic relations. Fontain v. Ravenel, 1854, 17 How. 369, 58 U.S. 369, 15 L.Ed. 80; and see In re Burrus, 1890, 136 U.S. 586, 593, 10 S.Ct. 850, 34 L.Ed. 500, and Williams v. North Carolina, 1945, 325 U.S. 226, 233, 237, 65

S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366."
161 F.2d at 689.

Three things can be said about Albanese v. Richter, *supra*. First, it has been overruled *sub silentio* by Carr v. Wisecup to the extent that it stands for any broad "domestic relations" exception. Second, it is distinguishable from our case because what was involved was an attempt to enforce in New Jersey a quasi-penal statute of New York or apply a quasi-penal New Jersey statute to a nonresident. Albanese v. Richter is a post-*Erie* case which totally disregards the obligation of a diversity court to make an *Erie* analysis. The case should have turned on whether a New Jersey forum would enforce the quasi-penal provisions of the New York statute or apply the quasi-penal provisions of its forum state's statute for the benefit of a nonresident. Third, both the circuit court opinion and the district court opinion are thoroughly indefensible. Of the authorities relied on in the circuit court opinion Fontain v. Ravenel, *supra*, decided a Pennsylvania will construction dispute over the application of the *cy pres* doctrine on the merits; In re Burrus, *supra*, held, correctly, that the old district court lacked diversity jurisdiction; and Williams v. North Carolina, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945) was a case on certiorari from a state court which adjudicated nothing whatsoever about district court jurisdiction. The district court opinion merely relied on the Taney error in reading article III § 2, an error, which so far as I can tell, no majority of the Supreme Court has ever espoused.

The dictum in Magaziner v. Montemuro, 468 F.2d 782, 787 (3d Cir. 1972) expressing approval of Albanese v. Richter, *supra*, is no more persuasive than the case. The controlling precedent in this Circuit is, or certainly should be, Carr v. Wisecup, *supra*, not Albanese v. Richter, *supra*. I would reverse and remand for a hearing.

**5.** *See, e. g.*, Vestel & Foster, Implied Limitations on the Diversity Jurisdiction of Federal Courts, 41 Minn.L.Rev. 1, 29, 31 (1956); Note, 54 Iowa L.Rev. 390, 391 n. 13 (1968).