**Larry FLYNT, Hustler Magazine, Inc., Herald Price Fahringer, and Paul J. Cambria, Jr., Plaintiffs-Appellees,**

v.

**Simon L. LEIS, Jr., Prosecuting Attorney for Hamilton County, William J. Morrissey, Judge of the Court of Common Pleas; Robert S. Kraft, Judge of the Court of Common Pleas, and the Hamilton County Court of Common Pleas, Defendants-Appellants.**

No. 77–3426.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 14, 1977.

Decided April 12, 1978.

Fred J. Cartolano, William E. Breyer, Cincinnati, Ohio, for defendants-appellants.

Andrew B. Dennison, Cincinnati, Ohio, Herald Price Fahringer, Paul J. Cambria, Jr., Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., for plaintiffs-appellees.

Before LIVELY, ENGEL and MERRITT, Circuit Judges.

MERRITT, Circuit Judge.

The Court of Common Pleas of Hamilton County, Ohio, has refused to allow two out-of-state lawyers, Herald Price Fahringer and Paul J. Cambria, Jr., to appear *pro hac vice* (meaning "for this turn" or case) on behalf of publisher Larry Flynt and Hustler Magazine, Inc., defendants in a pending state criminal obscenity case. After an unsuccessful attempt to obtain a writ of mandamus from the Supreme Court of Ohio, the two lawyers and their clients filed a complaint in the United States District Court for the Southern District of Ohio. They alleged a violation of the Sixth and Fourteenth Amendments and claimed federal jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

The District Court concluded that the attorneys' procedural due process rights under the Fourteenth Amendment were violated because the state court failed to hold a hearing before barring the attorneys' appearance *pro hac vice*. The District Court issued an injunction against the judges of the Court of Common Pleas and the local prosecutor, enjoining the prosecution of Flynt and Hustler temporarily until the two attorneys are granted a due process hearing. The judges and the prosecutor appeal. They argue that under the principle of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the federal court is precluded from enjoining the state prosecution, and that the two out-of-state lawyers were, in any event, properly refused *pro hac vice* admission.

We hold that the lawyers' rights of procedural due process were abridged and that the federal injunctive remedy does not transgress the principles of *Younger v. Harris* because the lawyers do not have an adequate state remedy in the pending state court proceedings.

## I. STATEMENT OF THE CASE

### A. The State Court Proceedings

Flynt and Hustler Magazine were indicted on February 8, 1977, under Ohio Revised Code § 2907.31 for disseminating material harmful to juveniles. The material in question was a publication entitled "War, The Real Obscenity," containing photographs which, according to the indictment, displayed "in lurid detail the violent physical torture, dismemberment, destruction or death of a human being." On February 25, 1977, the defendants were arraigned before Judge Rupert Doan. Prior to the arraignment, counsel-of-record forms were filed with the clerk of the Court of Common Pleas designating Fahringer as counsel for the defendant Flynt, Cambria as counsel for Hustler Magazine, and Andrew B. Dennison, a member of the Ohio Bar, as counsel for both defendants. These forms were approved and ordered entered of record by Judge Doan on February 23, 1977. The Judge made the entry under local Rule 10(F), which provides that the court itself must approve and enter counsel's appearance in the case and that trial counsel may

not thereafter withdraw without court permission.[1]

On March 9, 1977, Judge William J. Morrissey, to whom the case was assigned for trial, advised Dennison that Fahringer and Cambria would be stricken as counsel of record in the case. They appeared before Judge Morrissey on April 8, 1977. Without granting the lawyers a hearing, he said simply that "Mr. Fahringer and Mr. Cambria are not attorneys of record in this case and will not be permitted to try this case" and told Flynt, "you will be restricted to having an attorney that's admitted to practice in the State of Ohio." No other explanation was given.

A mandamus action was then filed in the Ohio Supreme Court, as well as an affidavit of bias and prejudice against Judge Morrissey. In a brief order the Court dismissed the mandamus action without explaining its reasons but granted the request to remove Judge Morrissey from the case. The case was reassigned for trial to Judge Robert Kraft who heard argument on whether the lawyers should be readmitted. Judge Kraft concluded that he was "bound" by the Ohio Supreme Court's decision dismissing the mandamus action and that he did not have the power to reopen the question.

### B. Admissions Pro Hac Vice Under Ohio Law

The Court of Common Pleas has no rule which specifically permits *pro hac vice* admission of out-of-state attorneys, but Rule I, § 8(C) of the Supreme Court of Ohio Rules for the Government of the Bar of Ohio allows "participation by a nonresident of Ohio in a cause being litigated in this state when such participation is with leave of the judge hearing such cause."[2] The desirability of *pro hac vice* admissions is also recognized by Canon 3 of Ohio's Code of Professional Responsibility which provides in part:

[T]he legal profession should discourage regulation that unreasonably imposes territorial limitations upon the right of a lawyer to handle the legal affairs of his client or upon the opportunity of a client to obtain the services of a lawyer of his choice in all matters including the presentation of a contested matter in a tribunal before which the lawyer is not permanently admitted to practice.[3]

The case law in Ohio establishes that the decision to grant special permission to appear is a matter "lying within the sound discretion of the trial court."[4]

It is customary in Cincinnati for the Court of Common Pleas to allow out-of-state counsel to appear *pro hac vice.* The same two out-of-state lawyers had previously appeared as trial counsel in other cases in Judge Morrissey's court without incident, and both appear to have exemplary academic and professional qualifications, including extensive experience handling First Amendment cases in state and federal courts.

### C. The Federal Court Proceedings

The two out-of-state lawyers and their clients filed a complaint in the United States District Court for the Southern District of Ohio asking for a finding that their Sixth and Fourteenth Amendment rights had been violated and for an injunction

---

1. Rule 10(E) provides: "Any attorney who accepts private employment in any criminal case shall be required to sign the following entry which shall be filed with the papers in the case: [Style of case] . . . . The undersigned has been retained as counsel for the above named defendant and moves the Court that such fact be entered of record. [Signature of Attorney] . . . . It is so ordered. [Signature of Judge] . . . . Thereupon such attorney shall become attorney of record upon the journal of this Court and shall not be permitted to withdraw except upon written motion and for good cause shown."

2. 29 Ohio St.2d xxiv (1972).

3. 23 Ohio St.2d 23 (1970). This language is the same as Canon 3, Ethical Consideration 3–9 of the American Bar Association's *Code of Professional Responsibility,* which has been adopted in Ohio and many other states.

4. *State v. Ross,* 36 Ohio App.2d 185, 188, 304 N.E.2d 396, 399 (1973), *cert. denied,* 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974).

temporarily delaying the state criminal trial until after the state court held a hearing to consider *pro hac vice* admission of the two attorneys.

The District Court found that the state court routinely admitted out-of-state lawyers *pro hac vice* in other cases without any procedural requirements apart from the filing and court approval of counsel-of-record forms, that such forms had been filed by Cambria and Fahringer and approved by court order, and that the state court had then removed the two lawyers from the case without an opportunity for a hearing and without a statement of reasons.

The District Court held that counsel may not be refused appearance *pro hac vice* except upon a showing of prior unethical conduct or refusal to abide by the canons of ethics or the rules of the court. It did not reach the issue of whether the constitutional rights of Flynt and Hustler Magazine had also been violated. The court noted the general rule that federal courts must not enjoin pending state criminal prosecutions except under extraordinary circumstances, *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), but it went on to hold that federal interference in the present case was justified since the two attorneys could not vindicate their federal rights in the ongoing state proceedings. On these grounds, the District Court issued an injunction against the Court of Common Pleas, temporarily enjoining the prosecution of the state action pending a hearing on the question of the admission of the lawyers *pro hac vice.* No hearing has yet been held.

## II. THE PROCEDURAL DUE PROCESS ISSUE

■ A client may terminate a lawyer's services without cause or reason, but due process and elementary fairness require that we observe certain principles for the protection of lawyer and client when a judicial officer discharges the lawyer. In order to insure regularity and impartiality in the administration of justice and secure the similar treatment of similar cases, judges may not upset reasonable expectations in the important affairs of life such as employment of counsel without a hearing, the application of a reasonably clear standard, and a statement of reasons. Otherwise, it would be too easy to justify, and too difficult to remedy, random arbitrariness and sporadic injustice.[5]

Precedent requires us to apply these principles of due process to the licensing and removal of officers of the court, including admissions *pro hac vice.* Federal courts have frequently invalidated arbitrary restrictions on bar admissions and the practice of law. Over one hundred years ago, the Supreme Court, in *Ex parte Garland,*[6] invalidated a federal statute excluding Confederate sympathizers from practice in federal courts. In *Konigsberg v. State Bar*[7] and *Schware v. Board of Bar Examiners,*[8] the Supreme Court held that California and New Mexico violated the Fourteenth Amendment by applying in an arbitrary way a vague standard in order to deny bar admission to applicants who had formerly belonged to the Communist party.[9] In a

---

5. For a discussion of the reasons underlying basic procedural due process rights, *see* Dworkin, *Taking Rights Seriously* 14–45 (1977); Rawls, *A Theory of Justice* 235–38 (1971).

6. 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867).

7. 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957).

8. 353 U.S. 232, 239 n. 5, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957): "We need not enter into a discussion whether the practice of law is a 'right' or 'privilege.' Regardless of how the State's grant of permission to engage in this occupation is characterized, it is sufficient to say that a person cannot be prevented from

practicing except for valid reasons. Certainly the practice of law is not a matter of the State's grace."

9. The Supreme Court has long held that the Fourteenth Amendment prohibits state imposition of an arbitrary standard or the arbitrary application of an inoffensive standard in order to deny employment opportunities to individuals. *See, e. g., Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *Slochower v. Board of Higher Educ.,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

recent series of cases the Supreme Court has invalidated attempts by state bar associations to prohibit group legal services plans.[10]

■ Due process and equal protection principles also apply to admission to practice *pro hac vice.* Judge Herbert Goodrich, writing for the Third Circuit in *Cooper v. Hutchinson,*[11] held that a state judge violated due process and the federal civil rights law in a New Jersey murder trial when, without a meaningful hearing or statement of reasons, he withdrew permission for out-of-state counsel to appear. Likewise, in *Ross v. Reda,*[12] this Circuit, while upholding a state judge's exclusion of out-of-state counsel for cause, suggested that "the prerogative of a trial judge to exclude out-of-state counsel, like the right of a defendant to be represented by the counsel of his choice, is not an absolute right,"[13] and may not be exercised arbitrarily. Defendants conceded at oral argument that an out-of-state lawyer could not be refused *pro hac vice* admission on grounds of race or for other constitutionally forbidden reasons. Of course, it is impossible to know whether a court based its decision on such factors if the court does not grant a hearing or give reasons for its refusal.

The longstanding practices and customs of the legal profession lead us to the same conclusion. Representation *pro hac vice* is not a new privilege. A long legal tradition supports such appearance by the American lawyer licensed in a sister state and the English barrister admitted under the auspices of a different court or Inn. The custom was well-recognized by English judges in the seventeenth century and by American judges by the middle of the nineteenth century, Judge Goodrich reports in *Cooper v. Hutchinson.*[14] In many instances private and public interests are well-served by lawyers who travel to other states and countries to plead a client's cause. Practically all of our states by statute or court rule, and the federal courts by custom or rule, now make provision for special court appearances by lawyers licensed in other jurisdictions;[15] and several countries allow foreign lawyers to appear *pro hac vice,* including the federal and local courts in Germany, Switzerland and Canada.[16]

Nonresident lawyers have appeared in many of our most celebrated cases. For example, Andrew Hamilton, a leader of the Philadelphia bar, defended John Peter Zenger in New York in 1735 in colonial America's most famous freedom-of-speech case.[17] Clarence Darrow appeared in many states to plead the cause of an unpopular client, including the famous *Scopes* trial in Tennessee where he opposed another well-known, out-of-state lawyer, William Jennings Bryan. Great lawyers from Alexander Hamilton and Daniel Webster to Charles Evans Hughes and John W. Davis were specially admitted for the trial of important cases in other states. A small group of lawyers appearing *pro hac vice*

---

10. See *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Brotherhood of R.R. Trainmen v. Virginia ex rel. Virginia State Bar,* 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); *UMW Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *United Transp. Union v. State Bar,* 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971). The states argued in these cases that such group legal activities constitute the unauthorized practice of law.

11. 184 F.2d 119 (3d Cir. 1950).

12. 510 F.2d 1172 (6th Cir. 1975), *cert. denied,* 423 U.S. 892, 96 S.Ct. 190, 46 L.Ed.2d 124.

13. *Id.* at 1173.

14. 184 F.2d 119, 122 (3d Cir. 1950).

15. See Katz, *Admission of Nonresident Attorneys Pro Hac Vice,* Research Contributions of the American Bar Foundation, No. 5 (1968); Brakel and Loh, *Regulating the Multi-State Practice of Law,* 50 Wash.L.Rev. 699 (1975); Note, *Easing Multi-State Practice Restrictions —"Good Cause" Based Limited Admission,* 29 Rutgers L.Rev. 1182 (1976); Note, *Appearances By Out-Of-State-Counsel,* 9 Conn.L.Rev. 136 (1976).

16. See Comment, *International Legal Practice Restrictions on the Migrant Attorney,* 15 Harv. Int'l L.J. 298 (1974).

17. See Alexander, *The Trial of John Peter Zenger* 17–26, 61 (1963).

inspired and initiated the civil rights movement in its early stages. In a series of cases brought in courts throughout the South, out-of-state lawyers Thurgood Marshall, Constance Motley and Spottswood Robinson, before their appointments to the federal bench, developed the legal principles which gave rise to the civil rights movement.[18]

There are a number of reasons for this tradition. "The demands of business and the mobility of our society" are the reasons given by the American Bar Association in Canon 3 of the Code of Professional Responsibility. That Canon discourages "territorial limitations" on the practice of law, including trial practice.[19] There are other reasons in addition to business reasons. A client may want a particular lawyer for a particular kind of case, and a lawyer may want to take the case because of the skill required. Often, as in the case of Andrew Hamilton, Darrow, Bryan and Thurgood Marshall, a lawyer participates in a case out of a sense of justice. He may feel a sense of duty to defend an unpopular defendant and in this way to give expression to his own moral sense.[20] These are important values, both for lawyers and clients, and should not be denied arbitrarily.

■ Ohio has no specific standards regarding *pro hac vice* admissions, and we cannot define with certainty the status of the lawyers at the moment they were dismissed. The state court had approved their counsel of record forms at arraignment and had allowed the lawyers to participate in the initial steps of the state court proceeding. They had an agreement with their clients, and once the court authorized them to act, their obligations to their clients and their reasonable expectations of professional service were strengthened, whatever may have been the nature of their interests when they originally sought admission. Their interests had developed to a point where the court's action in removing them not only deprived them of their expectation of service and remuneration but also adversely reflected upon their competence and integrity. Due process standards may perhaps differ depending on the stage of the proceedings, but here the lawyers' interest had clearly advanced to a stage where, as a matter of due process, they could not be denied the right to appear without a meaningful hearing, the application of a reasonably clear legal standard and the statement of a rational basis for exclusion.

## III. THE YOUNGER v. HARRIS ABSTENTION DOCTRINE

The second argument of the state judges and prosecutor is based on a judge-made principle of judicial restraint enunciated in 1971 in *Younger v. Harris*.[21] There a federal district court held California's criminal syndicalism statute unconstitutional and enjoined a pending state court prosecution under the statute. Issuing a broad call for judicial restraint in federal cases which may disrupt and offend state courts ("the normal thing to do when federal courts are asked to enjoin pending proceedings in state court is not to issue such injunctions"),[22] the Supreme Court decided under principles of equity and comity that lower federal courts should not enjoin a pending state criminal prosecution when the constitutional claimant has an adequate opportunity to raise his claim in the course of the state proceedings and an adequate state remedy appears to be available.

The first reason given in *Younger* for the "longstanding public policy against federal court interference with state court proceedings" is "the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if

---

**18.** *See* Kluger, *Simple Justice* (1975).

**19.** *See* text accompanying note 3, *supra*.

**20.** *See* Fried, *An Anatomy of Values* 132–36 (1972).

**21.** 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

**22.** *Id.* at 45, 91 S.Ct. at 751.

denied equitable relief." [23] The second reason is comity, "a proper respect for state functions . . . and . . . the belief. that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." [24]

█ The *Younger* abstention doctrine rests on the presumption that an adequate state remedy for the federal claim exists, and it is based on strong, practical considerations. [25] The doctrine applies only to cases in which a state court proceeding is already pending and expresses a preference in such cases for a resolution of the constitutional issues in the state court, thereby conserving legal manpower and litigant time and expense, minimizing delay, and encouraging compliance with state criminal laws. It recognizes and encourages fairness and increasing sensitivity by state courts in matters of constitutional law [26] and avoids unseemly conflict between court systems and judicial officers. [27]

The Supreme Court in *Monroe v. Pape*, [28] decided ten years before *Younger*, opened. up the federal courts to a flood of civil rights cases when it concluded that plaintiffs may bring a claim in federal court under § 1983 without exhausting their state judicial remedies. The effect was to create two competing forums or court systems for constitutional litigants to choose between. From 1960 to 1976, the number of civil rights cases filed in the federal courts increased from 280 to 12,392. [29] If, in addition, every arguably erroneous ruling by a state trial judge which might affect a defendant's constitutional rights were subject to immediate review and correction by a federal court, the present system of federal courts could probably not survive.

On the other hand, federal courts must also be sensitive to competing considerations, particularly the responsibility of federal courts to uphold national law and guard against the abridgement of federally-created rights, and they must not use the abstention doctrine as a pretext for allowing constitutional wrongs to go unremedied. We do not apply the abstention doctrine correctly if we view it as a return to the concepts of state sovereignty that existed during the era of *Chisholm v. Georgia*, [30] the Anti-Injunction Act of 1793 [31] and the adoption of the Eleventh Amendment. [32] Our concepts of federal judicial responsibility in relation to the states have changed over time with the adoption of the Civil War Amendments, the Civil Rights Acts, the assignment of civil rights and general federal question jurisdiction to the federal courts and the gradual change in our thinking about equal protection and due process following the two World Wars.

█ In weighing the various competing interests, *Younger* appears to strike this balance: Federal courts must abstain in

**23.** *Id.* at 43–44, 91 S.Ct. at 750.

**24.** *Id.* at 44, 91 S.Ct. at 750.

**25.** *See Developments in the Law, Section 1983 and Federalism*, 90 Harv.L.Rev. 1133, 1282–87 (1977).

**26.** *See* Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489 (1977).

**27.** For a brief description of how destructive competition among the prerogative, chancery and law courts undermined the legal system in 17th century England, *see* Plucknett, *A Concise History of the Common Law* 191–98 (5th ed. 1956).

**28.** 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**29.** *See* the *1976 Annual Report of the Director of the Administrative Office of the United States Courts*, Table 16.

**30.** 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793). *See* Goebel, *History of the Supreme Court of the United States, Antecedents and Beginnings to 1801*, 722–60 (1971).

**31.** Section 5, 1 Stat. 334–335 (1793): "[A] writ of injunction [shall not] be granted to stay proceedings in any court of a state." The current version of this statute, as amended, is codified in 28 U.S.C. § 2283 (1970) and now contains an exception allowing such injunctions in § 1983 actions, *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

**32.** *See generally* Jacobs, *The Eleventh Amendment and Sovereign Immunity* (1972).

favor of pending state court proceedings when good reasons exist for assuming that in the absence of federal intervention an adequate state remedy is available to correct the claimed constitutional violation.[33]

In the instant case the out-of-state lawyers do not have an adequate state remedy for the due process violation, and we therefore affirm the decision of the court below enjoining temporarily the state court proceedings pending a due process hearing. Without a meaningful hearing, the application of a clear legal standard, or a statement of reasons, the state trial judge removed out-of-state lawyers who, along with their clients, unsuccessfully carried the issue to the state supreme court where the appeal was dismissed, again without a statement of reasons. A second trial judge assigned to the case then refused to reconsider the issue on the grounds that the state supreme court order dismissing the appeal constituted a final decision precluding the lawyers from participation. These facts not only convince us that we may not justifiably assume that an adequate state remedy in the pending proceedings exists; it also appears that the lawyers have in fact exhausted their state trial and appellate remedies prior to filing this case.[34]

We do not ignore the possibility that the other plaintiffs, Flynt and Hustler Magazine, could raise a Sixth Amendment claim at trial and, if convicted in the Court of Common Pleas, upon direct appeal in state court. While this issue is not addressed by the parties, we have no reason to doubt that the Sixth Amendment claim can be raised as a defense or that the remedy provided by the state court system on appeal would be adequate to vindicate Sixth Amendment rights. As parties to the pending prosecution, however, Flynt and Hustler Magazine are in a different position than their attorneys, who are unable to raise their constitutional claims as a defense to the prosecution at trial or on appeal. The fact that Flynt and Hustler Magazine may have an adequate state court remedy cannot protect the separate employment interests of the lawyers. Neither party has suggested that the current state proceedings would provide an avenue for vindication of the lawyers' rights.

We also note that the considerations of comity in the present case are much less significant than in *Younger* and in other cases where the doctrine has been invoked. While the relief sought by the plaintiffs necessarily entails a delay in the state court criminal prosecution, the grant of relief will not permanently prevent the prosecution. Following the hearing, the state prosecution may go forward on the merits. The grant of relief by the federal court will not prevent the state from interpreting and enforcing its own criminal laws.

Thus the equity and comity considerations here are not the same as in *Younger*, while the need for a remedy in federal court is strong. We find support for the distinctions we have drawn above in the recent case of *Gerstein v. Pugh*.[35] There

**33.** Where the burden of persuasion of showing the "adequacy" or "inadequacy" of state remedies should be placed is a question as yet unanswered. In view of the difficulty of assessing in advance the "adequacy" of state remedies in hard cases, the current *Younger* standard may move toward the requirement of exhaustion of state remedies in the pending state case, including the exhaustion of appellate remedies.

**34.** Since the lawyers have exhausted their state remedies, the *Pullman* abstention doctrine is inapplicable. Under that doctrine, the federal action is stayed while the parties attempt to resolve in state court unsettled issues of state law which may make the resolution of the federal constitutional claim in federal court unnecessary. *See Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Field, *The Abstention Doctrine Today*, 125 U.Pa.L.Rev. 590 (1977); Field, *Abstention in Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine*, 122 U.Pa.L.Rev. 1071 (1974). For a case applying the *Pullman* doctrine in order to allow state courts to decide unsettled questions concerning *pro hac vice* admissions, *see Silverman v. Browning*, 359 F.Supp. 173 (D.Conn.1972), *aff'd mem.*, 411 U.S. 941, 93 S.Ct. 1927, 36 L.Ed.2d 406 (1973), *further considered after state court review*, 414 F.Supp. 80 (D.Conn.1976), *aff'd mem.*, 429 U.S. 876, 97 S.Ct. 228, 50 L.Ed.2d 162 (1976).

**35.** 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

Florida state authorities initiated a state criminal prosecution by filing a prosecutor's information rather than by grand jury indictment. Under this procedure neither a prior finding of probable cause nor a subsequent preliminary hearing was necessary. In a federal action filed by claimants who were defendants in the pending state prosecution, the Supreme Court required that the state grant defendants a preliminary hearing to determine whether there was a probable cause to support detention under the information. The court held the abstention doctrine no bar to the federal action because the "legality of pretrial detention without a judicial hearing" is a collateral "issue that could not be raised in defense of the criminal prosecution" and, therefore, "could not prejudice the conduct of the trial on the merits."[36] Similarly, in the present case, the exclusion of the lawyers is a collateral issue unrelated to the merits of the state criminal case. As the court said in *Gerstein*, "the injunction was not directed at the state prosecution as such;" it only required the state court to hold a hearing on a collateral issue.[37]

Finally, it seems that we would be in the position of deciding the merits of the lawyers' due process claim if we abstained. We would have to find that a remedy which is insufficient for purposes of due process— no hearing and no statement of reasons—is a sufficient remedy for purposes of abstention. We think the two standards are approximately the same for purposes of this case. On the merits of the procedural due process issue, the state remedies are constitutionally inadequate, and they are also inadequate to support abstention. The decision of the District Court is therefore affirmed.

---

**36.** *Id.* at 108 n. 9, 95 S.Ct. at 860.

**37.** *Id.* We recognize, of course, that *Gerstein* is not directly on point. There the injunction did not delay the prosecution but merely reached the issue of confinement pending trial; here the effect has been to halt the state criminal proceedings, although only temporarily.