**HUYNH THI ANH and Dao Thanh Linh, Plaintiffs-Appellants,**

v.

**Edward LEVI, Attorney General of the United States, et al., Defendants-Appellees.**

**No. 78–1094.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 30, 1978.

Decided Oct. 20, 1978.

---

2. This opinion likewise was not available to the district judge at the time of his decision.

Martin Guggenheim, Rena K. Uviller, Bruce J. Ennis, American Civil Liberties Union Foundation, New York City, for plaintiffs-appellants.

Frank J. Kelley, Atty. Gen. of Mich., Robert Derengoski, Sol. Gen., Lansing, Mich., Lawrence W. Chamblee, Dept. of Justice, Washington, D. C., Donald E. Shelton, Forsythe, Campbell, Vandenberg, Clevenger & Bishop, Ann Arbor, Mich., for defendants-appellees.

Before PHILLIPS, Chief Judge, MERRITT, Circuit Judge, and PECK, Senior Circuit Judge.

MERRITT, Circuit Judge.

Several thousand children were evacuated from South Vietnam to the United States by "Operation Babylift," an effort to airlift Vietnamese orphans out of South Vietnam just before the fall of the Saigon government in 1975. It turned out that 2700 of the children were not orphans. This case involves a dispute over the custody of four of those children. The dispute is between their grandmother and uncle on the one hand, and their American foster parents, who hope to adopt them, on the other. Treating plaintiffs' claims questioning custody of the children solely as a habeas corpus action, District Judge Churchill dismissed the complaint for failure to exhaust state judicial remedies. 427 F.Supp. 1281 (E.D.Mich.1977). We affirm his judgment.

### I.

The theory of the grandmother's case is that she is entitled to immediate custody of

the children as a matter of fundamental biological and moral right recognized by international law and incorporated in our federal domestic law by various constitutional, treaty and statutory provisions. She argues that she is entitled to this relief in habeas corpus under 28 U.S.C. § 2241, and in equity under 42 U.S.C. § 1983. She contends that her right is recognized in the following federal laws:

1. Treaties enforceable under 28 U.S.C. § 1331.

2. Section 9 of the Judiciary Act of 1789, now codified as 28 U.S.C. § 1350, which provides for a federal right of action "by an alien for a tort only, committed in violation of the *law of nations* or a treaty of the United States."

3. The immigration laws, specifically 8 U.S.C. § 1101(b), which she claims prevent adoption of aliens by U. S. citizens unless the children are "orphans because of the death or disappearance of, abandonment or desertion by, or separation or loss from, both parents."

4. The equal protection and due process clauses of the fourteenth amendment.

This case is not the first case involving "Operation Babylift" which has found its way into the courts. See *Nguyen Da Yen v. Kissinger,* 528 F.2d 1194 (9th Cir. 1975). When the operations were over, it soon became apparent that some of the children brought to the United States and placed in foster homes were not in fact orphaned or abandoned. They had been evacuated by mistake or through the efforts of concerned relatives who viewed the airlift as the safest means of getting their children out of the country.

According to the complaint, this was the situation here. The children's grandmother, Huynh Thi Anh, who had cared for them in South Vietnam, arranged for their evacuation by turning them over temporarily to another person who turned them over to an orphanage in April, 1975. She then followed them to the United States later by ship with their uncle, Dao Thanh Linh.

The grandmother and uncle were detained at Camp Pendleton pending government processing. Meanwhile, the four boys, ages 12, 11, 9 and 8 at that time, had arrived in San Francisco and were moved for a temporary stay to a convent in Mount Angel, Oregon. By the time the grandmother and uncle reached Mount Angel, representatives of the Michigan Department of Social Services had taken the children, separated them, and placed them in two foster homes in Michigan. The Michigan social workers relied upon "releases" signed by the director of an orphanage in Vietnam which stated that the children were orphans. At the time the children were removed from Oregon, the social workers were advised that the grandmother was in the country and that the releases were probably invalid.

The foster parents instituted adoption proceedings in local Michigan courts. The grandmother and uncle then brought this suit in federal district court seeking to enjoin the state adoption proceedings and acquire custody of the children.

There are four groups of defendants which the plaintiffs allege currently exercise or control the custody of the children: (1) The federal defendants are the Attorney General of the United States and various officials of the Immigration and Naturalization Service. The plaintiffs claim in essence that these federal officials not only have the power under the immigration laws to admit or exclude the children from the United States, but also have the duty to grant custody of the children to the plaintiffs. (2) The state defendants are the Michigan Department of Social Services and several of its employees. The plaintiffs say that the Michigan defendants took the children and have continued to deprive their relatives of custody by placing the children in foster homes. (3) The judicial defendants are Michigan probate judges. The plaintiffs originally sought to enjoin adoption proceedings in their courts, but they have not appealed the lower court's dissolution of its preliminary injunction. (4) The foster parent defendants are Mr. and Mrs. Arvidson and Mr. and Mrs. Donaldson, residents of Michigan.

The substance of the claims is this: Having reared the children in her home in Saigon in the absence of their natural parents due to the war, the grandmother claims she has parental rights or interests in the children under Vietnamese law or, more broadly, an interest in the unity and integrity of their family under federal and international law. She says she turned the children over for evacuation to others in Vietnam who mistakenly signed papers releasing the children for adoption, but she has never intentionally abandoned or released them. She asks us to find in the sources of international and domestic law enumerated above the following rule of law for the protection of aliens: Where a close relative other than the natural parents has reared and cared for a child in a different culture but has voluntarily given up custody temporarily for evacuation to another country due to the exigencies of war, the relative is entitled to custody in the new country if she has not abandoned or otherwise abused or neglected the child.

■ We hold that there is no rule or principle of international law or federal domestic law which requires that the children be returned to plaintiffs' custody without determining their eligibility for adoption and weighing the desires of the children and their best interests in accordance with the law of the state of their residence.

## II.

■ **1. Treaties.**—The treaties or conventions on which plaintiffs rely do not create a private right of action for aliens in the federal courts. Plaintiffs point to general language in Articles 24 and 49 of the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, 75 U.N.T.S. 287 (education of children separated from parents by war should be entrusted to "persons of a similar cultural tradition"); Article 4 of the Convention Relating to the Status of Refugees, 19 U.S.T. 6264 (refu-

gees entitled to practice their religion and teach it to their children), and Article 16 of the United Nations Declaration of Human Rights (the family is the foundation of society and entitled to protection). The language relied on in each of these three documents is very general and does not answer the custody question presented by this case. In addition, it does not appear that the Geneva Convention or the Declaration of Rights are in fact treaties in force in the United States. Moreover, there is no evidence that any of the general language relied upon by plaintiffs was intended to be self-executing or to create private rights of action in the domestic courts of the signatory countries, in the absence of further domestic legislative action.[1] The international documents relied upon by plaintiffs, therefore, do not create private rights and duties respecting custody enforceable as treaties under 28 U.S.C. § 1331.

■ **2. The Alien Tort Claims Act.**—The statute gives federal courts jurisdiction of civil actions "by an alien for a tort only, committed in violation of the law of nations." 28 U.S.C. § 1350. Assuming *arguendo* that the wrongful refusal to return a child to the custody of its parent is a "tort only" within the meaning of the statute,[2] and that Congress has the constitutional authority under Article III to grant federal courts jurisdiction to create a federal common law of torts for aliens, our research does not disclose in the traditional sources of the "law of nations," or private international law, a universal or generally accepted substantive rule or principle which grants custody of children to grandparents over foster parents, as a matter of right, in the absence of weighing the desires of the children and the other available alternatives.

To find the applicable law respecting adoption and custody of alien children, we must therefore turn to international choice-of-law rules. The most recent Hague Convention on choice-of-law rules governing

---

1. See Steiner & Vats, *Transnational Legal Problems* 580–85 (2d ed. 1976); *Rest. 2d, Foreign Relations Law of U. S.* § 141 (1965).

2. See *Rest. 2d* Torts § 700 (1977); Annot., "Alien Tort Actions," 34 *A.L.R. Fed.* 388 (1977).

the status of children, entitled the Hague Convention Concerning the Powers of Authorities and the Law Applicable in Respect of the Protection of Infants, adopted September 17, 1971, appears to modify the rule of the Hague Convention of 1902 Governing the Guardianship of Infants. The 1902 Convention provided that a child's status is governed by the law of its nationality or its parents' nationality. The 1971 Hague Convention modifies the 1902 Convention by providing that the *lex fori* of the place of the child's "habitual residence" should be taken into account in determining the child's eligibility for adoption and rights of custody. The Hague Convention is somewhat ambiguous, and the question is not free from doubt.[3]

■ The United States, however, has not ratified either of these Hague Conventions. The normal American conflict of laws principle holds that a court having jurisdiction in an adoption or custody matter applies its own domestic law, including apparently its rules concerning choice of law.[4] Anglo-American law, as distinguished from civil law, disfavors choice-of-law principles based on nationality.[5] It seems that the most recent Hague Convention on choice of law would also look to the domestic law of the forum in adoption and child custody matters. Thus, it would appear that under both the most recent Hague rule and American choice-of-law principles the law of Michigan would apply, including its choice-of-law rule, in determining the childrens' eligibility for adoption and custody.

■ This means that the "law of nations," to the extent that it speaks on the subject, does not demand a particular substantive rule regarding custody of alien children. It refers us to the law of Michi-gan. Michigan courts are in the best position to apply their own law in this respect. Whatever the first Congress may have meant in 1789 when it used the phrase "law of nations" in the first judiciary act,[6] we do not believe that these words should be construed to vest jurisdiction in the federal courts over an alien claim when the only effect of the "law of nations" is to suggest that the applicable standard is to be found in the domestic law of a state within the federal union. There is no internationally recognized rule which would necessarily apply the substantive law of a foreign country. The federal interest in the question therefore seems too remote, and the state interest too strong, for us to assume a federal jurisdiction under the "law of nations." We should not displace the customary jurisdiction of the state courts.

**3. Difficulties of Determining Vietnamese Law.**—There might be some justification for assuming federal jurisdiction under the Alien Tort Claims Act if the "law of nations" required us to apply the personal law of the children, i. e., the law of nationality or Vietnamese law. But international choice-of-law principles are ambiguous, at best. Anglo-American legal principles disfavor choice-of-law rules based on nationality. We should not create federal jurisdiction by applying a choice-of-law rule which is inconsistent with our legal tradition under these circumstances.

■ Moreover, even if we created federal jurisdiction by applying the law of nationality, which would refer us to Vietnamese law, we are uncertain what the law of the Republic of South Vietnam is or was at the time of its conquest by the North. There is strong evidence that South Vietnam adopted a law in 1972 which gives relatives,

---

3. See Wahler, *The Convention on the Protection of Infants and the Judicial Practice in West German Courts* and also Spiro, *The Interest of the Child and the Conflict of Laws,* in Proceedings of the First World Conference of the International Society on Family Law, *The Child and The Law,* vol. 2, pp. 507, 519 (1975).

4. *Rest. 2d* Conflict of Laws §§ 78, 289 (1971).

5. See 2 Ehrenzweig & Jayne, *Private International Law* 90, 243–50 (1973); Dicey & Morris, *Conflict of Laws* 407–8 (9th Ed. 1973).

6. See Steiner & Vats, *Transnational Legal Problems,* 550 (2d ed. 1976); Dickinson, *The Law of Nations as Part of the National Law of the United States,* 101 U.Pa.L.Rev. 26, 792 (1952).

including grandparents, much broader parental rights in children than under the law of the United States.[7] We cannot determine, however, whether this vesting of broader parental rights in the extended family unit was a temporary measure taken in response to the disruption of normal family life caused by war or is a deeply embedded tradition in Vietnamese culture. Under the circumstances presented by this case, we cannot possibly determine what recognition Vietnamese law would now give to the wishes of the children or what weight Vietnamese law would give to alternatives other than returning the children to the custody of plaintiffs. Even if we were to apply Vietnamese law, as a matter of international choice of law, we could not say that the complaint states a cause of action in tort under the "law of nations." We do not find a clear, substantive rule of Vietnamese law vesting custody of the children in the plaintiffs without regard to the children's wishes and without consideration of the competing interests in an effort to find the least detrimental alternative available.

**4. Immigration Laws.**—The four children were "paroled" into the United States under 8 U.S.C. § 1182(d)(5), a provision which allows the Attorney General in emergency situations to temporarily waive the usual requirements for an alien's entry into the country, pending a formal determination of the alien's application for admission. They were not admitted as "immediate relatives" of United States citizens. The provisions of § 1151(a), which incorporate the definitions concerning "children" and "orphans" in § 1101(b), do not limit the Attorney General's authority under § 1182(d)(5). An alien paroled into the country under § 1182(d)(5) is allowed physically to enter the country even though he has not yet been admitted in the legal sense as an immigrant. The Immigration and Naturalization Service has not adjudicated parental rights or taken a position on the custody question but has simply given the children the freedom to be in the country.

By admitting the children as aliens, did the INS acquire a further duty to require their removal from Michigan and insure reunification with their relatives? Such arrangements would be unrelated to simply insuring prompt and safe return upon revocation of parole. Although the INS would have had the discretion to release the children directly to their relatives as an initial matter, if the relatives' whereabouts had been known, a full-fledged investigation into the possible presence of relatives in the country and the validity of claims to parental custody of the children is not one of the tasks required before parole can be granted. The Attorney General's function is not to decide whether a child has been abandoned, whether parental rights were voluntarily released abroad and whether persons claiming parental rights in fact have valid claims. Parole status is an interim status, and the Attorney General is legitimately concerned simply with insuring prompt and safe return upon revocation of parole, not with a sweeping factual investigation of an alien child's background.

As in *Matters v. Ryan,* 249 U.S. 375, 39 S.Ct. 315, 63 L.Ed. 654 (1918), and *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), we conclude that the decisions made by the Attorney General pursuant to the immigration laws, even if they had the indirect effect of allowing family separation to be prolonged, do not provide a valid basis for a statutory claim.

**5. Constitutional Claims.**—Plaintiffs alleged in one section of their complaint and argue on appeal that the defendants are motivated by religious and racial considerations in violation of the establishment and equal protection clauses of the first and fourteenth amendments. They allege that the foster parents, the Michigan social workers and the Attorney General are discriminating against them because their skin is yellow, not white, and their

---

7. See Besikof, *United States Adoption of Vietnamese Children: Vital Considerations for the Courts,* 52 Denver L.J. 771 (1975).

religion is Buddhist, not Christian. Plaintiffs do not state any facts to support this claim other than defendants' refusal to deliver the children to their custody. We have reviewed the answers to interrogatories and the discovery depositions in the record. We do not find factual support for these claims. We do not believe these conclusory allegations in light of the record are sufficient to state a constitutional claim in the context of this case.

■ Plaintiffs also argue that they have been deprived of the custody of the children without due process of law, both procedural and substantive. They do not identify, however, any particular Michigan standard or procedure as unconstitutional, nor do they identify any failure on the part of Michigan to comply with existing statutes and regulations. They do not challenge some formal, final action such as an actual termination of parental rights or an adoption decree as constitutionally defective. They speak of lack of notice and opportunity for a hearing, but their contentions in this regard are unclear. Certainly notice and an opportunity to be heard are necessary before parental rights can be terminated, but here no termination of parental rights has been declared, and there appears to be no question that the plaintiffs will have an opportunity to be heard before the state courts decide the issue. Courts have held that children may not be summarily removed from the custody of their parents except in emergency circumstances. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Even if the plaintiffs in this case demonstrate parental rights to the children, however, they do not claim that the children were taken out of their immediate custody, but only out of the custody of the Benedictine Sisters in Oregon.

The constitutional language of the complaint cloaks a simple claim to "live together as a family" which lies at the heart of any custody dispute. This point is highlighted when we consider the nature of the relief requested by the plaintiffs. They do not seek procedural rights or a declaration that a particular law is unconstitutional. Rather, they ask the federal courts in essence to issue a custody decree granting permanent custody to the plaintiffs, and declaring the foster parents' and the state's claims to the children to be invalid. They ask us to adopt a rule of substantive due process that an alien grandparent is entitled to custody in the absence of the natural parents of the children. This may very well turn out to be the proper decision in the case in the courts of Michigan, but as a matter of family law, not of substantive due process.

■ **6. Exhaustion of State Remedies in Child Custody Disputes.**—We conclude also that the federal courts should not assert jurisdiction for reasons of federal-state comity and because plaintiffs' state remedies are adequate.[8] Traditionally, disputes involving domestic relations including child custody and adoption proceedings, have been thought to be wholly within the province of the state courts. The cases recognize the "local" nature of domestic relations problems, the strong interest of the states in addressing such questions without interference, and the expertise of local agencies and courts in monitoring and resolving domestic relations matters. While older cases indicate that federal courts are entirely without jurisdiction to grant divorces or award custody of children, more recent decisions hold that strong policies of federal-state comity and deference to state expertise in the area are the theoretical underpinnings of federal courts' refusal to consider such cases.[9]

The policies favoring state court resolution are extremely strong. For example, in *Ohio ex rel. Popovici v. Agler*, 280 U.S. 379,

---

**8.** See our discussion of this question in *Flynt v. Leis*, 574 F.2d 874 (6th Cir. 1978).

**9.** Compare *Ex parte Burrus*, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500 (1890), *with Solomon v. Solomon*, 516 F.2d 1018 (3rd Cir. 1975) and

*Phillips v. Rosentiel*, 490 F.2d 509 (2nd Cir. 1973). See Hart & Wechsler, *The Federal Courts and the Federal System* 1186–92 (2nd ed. 1973).

50 S.Ct. 154, 74 L.Ed. 489 (1930), a Rumanian vice consul sought a writ of prohibition from the Ohio Supreme Court against divorce proceedings by his wife in Ohio state courts. Despite explicit constitutional and statutory language giving federal courts exclusive jurisdiction over proceedings against ambassadors and consuls, the United States Supreme Court affirmed a denial of the writ on the grounds that " 'the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states and not to the laws of the United States.' " [10] In *Solomon v. Solomon*, 516 F.2d 1018, 1024 (3rd Cir. 1975), having extensively reviewed the "judicially carved" domestic relations doctrine, the Third Circuit refused to assert jurisdiction over a divorced wife's suit against her ex-husband for non-support. "The import of the Supreme Court's language in these cases is that the federal courts do not have jurisdiction in domestic relations suits *except* where necessary to the effectuation of prior state court judgments involving the same matters or where jurisdiction lies by dint of" a clear federal question. The court emphasized that custody of the children was involved, that state court litigation on related issues was pending, and that a danger existed that the parties would attempt to play one court system off against another. *Id.* at 1025. The court also noted, "[T]he modern view [is] that state courts have historically decided these matters and have developed both a well-known expertise in these cases and a strong interest in disposing of them." *Ibid.*

In this case, adoption proceedings had already been filed by the foster parents in state court before suit was brought by the plaintiffs in federal court, and the adoption proceedings are still pending. Although the plaintiffs have decided not to pursue their initial request for an injunction against the state adoption proceedings, the relief they seek would effectively bring the adoption proceedings to a halt. The plaintiffs ask the federal court to declare that the chil-

dren may not be adopted, and to order that the children be placed in the custody of the plaintiffs. The issues of whether the children may be adopted and whether the foster parents may have custody of the children are precisely the same issues before the state court. While the case is not strictly the same as in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), where an injunction against pending criminal proceedings was sought, the reasons given by the Supreme Court for declining jurisdiction and deferring to the state court in that case are highly relevant here. Equitable principles favor adjudication of issues in one proceeding rather than in multiple proceedings for the sake of fairness and judicial efficiency. Here, as in *Younger*, the issues could all be resolved in the pending state proceeding. Second, strong considerations of comity lead federal courts to prevent friction with states and avoid interfering in state proceedings, particularly where the federal questions presented are closely intertwined with issues of strong local interest.

Plaintiffs have not exhausted their state remedies, and we would therefore lack jurisdiction if the plaintiffs' suit is viewed as a habeas corpus petition under 28 U.S.C. § 2241(c), challenging the custody of the children by the state and its agents as contrary to the Constitution, laws, and treaties of the United States. Under the case law developed in the criminal area, habeas corpus petitions may be filed in federal district court to challenge state custody only after state remedies have been exhausted and the federal claims have been presented to the State courts for consideration. *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Just as administration of the criminal justice system is recognized to be a matter of considerable local concern, so domestic relations is an area of predominantly local interest. Thus, even if a legitimate constitutional claim is presented, the potential disruption of pending proceedings

---

10. 280 U.S. at 383, 50 S.Ct. at 154, *quoting Ex parte Burrus*, 136 U.S. 586, 593, 10 S.Ct. 850, 34 L.Ed. 500 (1890), a case involving a custody dispute between a child's father and grandparents.

and the ensuing friction in our federal system provide good reasons for deferring to state proceedings and declining federal jurisdiction.

There is one strong additional factor that influences our thinking. The remedies available to all parties under Michigan law are fair and adequate. The Michigan courts must first find that the children are eligible for adoption under Michigan law. Its law establishes a fair set of procedures and standards for deciding this question.[11] Then if the children are eligible, the court would proceed to weigh the "best interests" of the children under the following standard:

(a) The love, affection and other emotional ties existing between the competing parties and the child; (b) The capacity and disposition of competing parties to give the child love, affection and guidance and continuation of the educating and raising of the child in its religion or creed, if any; (c) The capacity and disposition of competing parties to provide the child with food, clothing, medical care or other remedial care . . .; (d) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity; . . . (f) The moral fitness of the competing parties; (g) The mental and physical health of the competing parties; (h) The home, school and community record of the child; (i) The reasonable preference of the child, if the court deems the child to be of sufficient age to express preference.

Mich.Comp.Laws Ann. § 722.23 (Supp.1978).

In this connection, we should stress our sympathetic concern under the facts alleged for the adversity this brave grandmother has suffered, victimized by war, and perhaps by poverty and prejudice, a wise and aged woman who courageously saved her grandchildren and then followed them to a new country, only to be denied their compa-

ny. She was asked in a discovery deposition if she would consider giving the children up for adoption, and she replied,

Yes, if the Americans have helped in their evacuation, I would let them adopt them, but they let them down in Saigon. We brought them here. If they don't return to us, the Americans, the Americans, unjust.

This is not an easy case. We sit in judgment of her petition, but we are concerned that she may be right in her judgment of us. We are tempted to place the children with her, as compensation for her suffering, as a reward for her courage, and to assuage our own feelings. We also recognize the vigor and intelligence with which her lawyers have represented her. But in light of the fact that the record does not disclose the wishes of the children or the extent to which their foster parents have become their psychological parents during the last three years, we are hard pressed to determine who would be most harmed by the denial of custody.[12]

There are some questions that are too hard and too remote from the experience of federal judges and bring home to us again the wisdom of the past in giving us a social union with a *federal* structure. Our experience and sense of fairness teach us that this is not a case where the application of a federal *rule*,[13] whether of constitutional, international or statutory origin, is likely to provide the best answer. We must rely on a judge in a court of family law—with its more flexible standards and with the parties before him and their latest circumstances in mind—to balance the equities and seek compromises that best accommodate the interests of the parties.

For these reasons, we affirm the judgment of Judge Churchill in the District Court. Each party shall pay his own costs on appeal.

11. See Mich.Comp.Laws Ann. §§ 710.39–710.44, 722.22 (Supp.1978).

12. See Goldstein, Freud & Solnit, *Beyond the Best Interests of the Child* 105–10 (1973).

13. See Kennedy, *Form and Substance in Private Law Adjudication*, 89 Harv.L.Rev. 1685 (1976).