**Darlyn DeWYSE, Plaintiff,**

v.

**Jane SMITH, Peggy Buteyn, John Morley, Mary Ann DeWyse, and Doreen DeWyse, Defendants.**

**No. K 81–188.**

United States District Court, W. D. Michigan, S. D.

Feb. 25, 1982.

Martin Glista, Kalamazoo, Mich., for plaintiff.

Paul Domeny, Kalamazoo, Mich., for Mary Ann and Doreen DeWyse.

Janis Meija, Asst. Atty. Gen., Lansing, Mich., for Jane Smith and Peggy Buteyn.

A. Peter Govorchin, Asst. Atty. Gen., Lansing, Mich., for John Morley.

OPINION

ENSLEN, District Judge.

This matter was filed pursuant to 42 U.S.C. § 1983 on July 1, 1981 by the Plaintiff to enjoin the Defendants from taking any action to prevent Plaintiff from "having the care, custody and control" of her minor child, Brandon Michael DeWyse, or to prevent her from associating with one Joe Ouilette during the pendency of this litigation. The Defendants have moved to dismiss the action. Upon due consideration, the Court is of the opinion that this matter should be dismissed.

On October 16, 1980 the St. Joseph County Probate Court entered an order, following a hearing, making Brandon Michael DeWyse a temporary ward of the Court and placing young Brandon temporarily in the home of his grandparents. Plaintiff petitioned for a rehearing on January 29, 1981, which rehearing was granted and held on February 5, 1981. After due consideration, the Probate Court entered an order that same day continuing the temporary wardship of Brandon and his temporary placement with his grandparents. The court also ordered Joe Ouilette to have no contact with Brandon or Plaintiff and directed that Brandon undergo certain tests, at the completion of which, Brandon would be returned to Plaintiff. On May 5, 1981, Defendant Peggy Buteyn filed a petition for rehearing representing that Brandon's testing was completed and that Plaintiff was in violation of the Probate Court's February 5, 1981 order in that she had continued to see Joe Ouilette since the issuance of said order. A hearing was held on May 14, 1981 on Buteyn's petition resulting in an order which continued temporary wardship of Brandon and maintained his placement with his grandparents. The Probate Court also directed that Plaintiff and Brandon have no contact whatsoever with Joe Ouilette. Plaintiff took an appeal to the St. Joseph County Circuit Court on May 14, 1981, which appeal is still pending.

Defendants urge this Court to abstain from exercising jurisdiction over this controversy and cite in support *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) where the Supreme Court held that absent extraordinary circumstances a federal court should not enjoin a pending state criminal proceeding. Subsequent decisions have made it clear that the policy of equitable restraint expressed in *Younger* was not based on factors unique to a criminal trial:

> *(Younger)* reflects a strong policy against federal intervention in state judicial processes in the absence of great and irreparable injury to the federal plaintiff. . . . The basic concern—that threat to our federal system posed by displace-

ment of state courts by those of the National Government—is also fully applicable to civil proceedings in which important state interests are involved.

*Moore v. Sims*, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979). See also, *Trainor v. Hernandez*, 431 U.S. 434, 444, 97 S.Ct. 1911, 1918, 52 L.Ed.2d 486 (1977) and *J. P. et al. v. De Santi, et al.*, 653 F.2d 1080 (CA 6 1981).

Plaintiff's suit challenges, in essence, the statutory scheme by which a parent's rights are involuntarily terminated. Unquestionably, the state has a strong interest in addressing such questions involving domestic relations problems. Thus, *Younger* principles of abstention are called into play.

Defendants assert that Plaintiff must exhaust her state court remedies before she can bring this § 1983 action. In *Ellis v. Dyson*, 421 U.S. 426, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975) the Supreme Court held that exhaustion of state remedies is not a prerequisite to a § 1983 action. There, after being convicted and fined by the Municipal Court of Dallas, on pleas of *nolo contendere*, for violating the Dallas loitering ordinance, petitioners, rather than seeking a trial *de novo* in County Court, and thus subjecting themselves to the possibility of a larger fine, brought a § 1983 action in federal district court challenging the constitutionality of the ordinance and seeking declaratory, and other relief. The district court dismissed the action, holding that federal declaratory and injunctive relief against a future state criminal prosecution was not available absent allegations of bad-faith prosecution, harassment, or other unusual circumstances presenting a likelihood of irreparable injury to petitioner if the ordinance were enforced, a result felt to be mandated by the decision in *Becker v. Thompson*, 459 F.2d 919 (CA 5 1972). In *Becker* it was held that the principles of *Younger, supra*, applied not only where a state criminal prosecution was actually pending, but also where a prosecution was merely threatened. The Fifth Circuit affirmed, and the Supreme Court reversed and remanded, holding that *federal declara-*

*tory relief* is not precluded when a state prosecution, based upon an assertedly unconstitutional state statute, has been threatened, but is not pending, even if a showing of bad faith enforcement or other special circumstances has not been made.

*Ellis* appears to be less than pervasive as the Supreme Court in *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) interpreted the principles of *Younger* to require the exhaustion of state court remedies in a § 1983 action. There, an Ohio public nuisance statute which provided, *inter alia*, that a place exhibiting obscene films is a nuisance, required up to a year's closure of any place determined to be a nuisance, and also provided for the sale of personalty used in conducting the nuisance, was called into question. Ohio officials instituted a proceeding under this statute in state court against appellee Pursue's predecessor as operator of the theater displaying pornographic films, resulting in a judgment in appellant's favor and an order closing the theater for a year and the seizure and sale of the personal property used in its operation. Rather than appealing within the state system, appellee, which had taken over the operation, immediately filed suit in federal district court under 42 U.S.C. § 1983, alleging that appellant's use of the nuisance statute constituted a deprivation of constitutional rights under the color of state law, and seeking injunctive and declaratory relief. Without considering the application of *Younger*, the district court declared the nuisance statute unconstitutional and enjoined the extension of the state court's judgment insofar as it closed the theater to films that had not been adjudged obscene in prior adversary hearings.

The *Huffman* court remanded and emphasized that the relevant considerations of federalism and comity counsel heavily toward federal restraint, since interference with a state judicial proceeding prevents the state not only from effectuating its substantive policies, but also from continuing to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies. The court recog-

nized that such interference results in duplicative legal proceedings, and can readily be interpreted " 'as reflecting negatively upon the state court's ability to enforce constitutional principles' ". *Id.* at 604, 95 S.Ct. at 1208 quoting from *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). After finding that the state court judgment had not yet become final, Justice Rehnquist wrote for the majority:

> For regardless of when the Court of Common Pleas' judgment became final, we believe that *a necessary concomitant of Younger is that a party in appellee's posture must exhaust his state appellate remedies before seeking relief in the District Court*, unless he can bring himself within one of the exceptions specified by *Younger*.

> Virtually all of the evils at which *Younger* is directed would inhere in federal intervention prior to completion of state appellate proceedings, just as surely as they would if such intervention occurred at or before trial. Intervention at the later stage is if anything more highly duplicative, since an entire trial has already taken place, and it is also a direct aspersion on the capabilities and good faith of state appellate courts. Nor, in these state-initiated nuisance proceedings, is federal intervention at the appellate stage any the less a disruption of the State's efforts to protect interests which it deems important. Indeed, it is likely to be even more disruptive and offensive because the State has already won a nisirius determination that its valid policies are being violated in a fashion which justifies judicial abatement.

> Federal post-trial intervention, in a fashion designed to annul the results of a state trial, also deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction. We think this consideration to be of some importance because it is typically a judicial system's appellate courts which are by their nature a liti-

gant's most appropriate forum for the resolution of constitutional contentions... In short, we do not believe that a State's judicial system would be fairly accorded the opportunity to resolve federal issues arising in its courts if a federal district court were permitted to substitute itself for the State's appellate courts. *We therefore hold that Younger standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies. Id.* at 608–609, 95 S.Ct. at 1210. (Emphasis supplied; footnotes omitted)

Similar to the facts of *Huffman*, Plaintiff seeks to enjoin the state court appellate proceedings through the institution of this § 1983 cause of action. In view of *Huffman* this Court is loathe to entertain this action unless Plaintiff establishes that early intervention is justified under all of the exceptions recognized in *Younger*.

■ The *Younger* court held that extraordinary circumstances must be present to justify federal injunctive relief against a state criminal prosecution and stated that a movant must show not merely the "irreparable injury" which is a normal prerequisite for an injunction, but also must show that the injury would be " 'great and immediate' " 401 U.S. at 46, 91 S.Ct. at 751. The opinion also suggested that only in extraordinary situations could the necessary injury be shown if the prosecution was conducted in good faith and without an intent to harass. *Id.* at 54, 91 S.Ct. at 755.

■ Here, Plaintiff has been deprived of the custody of her son since October 1980 through the intervention of the State of Michigan and, as a consequence, contends that she has, and currently is, suffering an irreparable injury. She refers the Court to *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) where the United States Supreme Court recognized the cardinal right of a parent to the custody, care and nurture of that parent's child. Without question, the integrity of the family unit is deserving of respect and deference. However, the *Stanley* court also rec-

ognized that certain situations arise where, to protect the children of a family, intervention by the state is necessitated and the termination of parental duties and responsibilities needed. Indeed, the Sixth Circuit has noted that the state courts have developed both a well known expertise in cases of this nature, and a strong interest in disposing of them. *Huynh Thi Anh v. Levi*, 586 F.2d 625 (CA 6 1978). This state interest was exercised in the instant case. *Younger* counsels abstention unless the threatened injury is "great, immediate, and irreparable"; *unless " 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issue before it..." Moore v. Sims, supra* 442 U.S. at 433, 99 S.Ct. at 2382 (citation omitted; emphasis supplied). While it is easily understood that Plaintiff's injury is great, it cannot likewise be said that that injury is necessarily irreparable as she is presently contesting the same through the state appellate process. Moreover, as explained in *Levi*, the state court is quite capable of fairly and fully adjudicating the ultimate issue of who is best suited to undertake and maintain the awesome responsibility of raising a young child. Indeed, as the *Huffman* court explained, "the considerations of comity and federalism which underlie *Younger* permit no truncation of the exhaustion requirement merely because the losing party in the state court of general jurisdiction believes that his chances of success on appeal are not auspicious." 420 U.S. at 610, 95 S.Ct. at 1211. It does not appear that the extraordinary circumstances envisioned by *Younger* are present in this case. Accordingly, the continuation of Brandon's temporary wardship status and his placement in his grandparents' home pending the outcome of the state court proceedings will not constitute great and immediate irreparable harm to either Brandon or Plaintiff.

Finally, it is noted that Plaintiff has made no demonstration of bad faith or harassment on the part of Defendants in their institution of the suit which forms the basis of this § 1983 claim. As Plaintiff has

not exhausted her state court remedies and is in the midst of the state appellate process, the Court declines to exercise federal jurisdiction over the instant case.

The Sixth Circuit has also counseled against asserting jurisdiction in a case of this nature. The interest in the preservation of federal-state comity which underlies *Younger* was emphasized by the Sixth Circuit in *Levi*. There, a grandmother sought custody of her grandchildren who were part of the Vietnamese Orphans Babylift. The grandmother claimed that the children were being detained in violation of United States Treaties, immigration laws and the Constitution. The *Levi* court noted that traditionally disputes involving domestic relations, including child custody and adoption proceedings, have been thought to be wholly within the province of the state courts. It was the recognition by the court of the "local" nature of these problems, the strong interest of the states in addressing such questions without interference, and the expertise of local agencies and courts in monitoring and resolving domestic relations matters which prompted the court to state:

> While older cases indicate that federal courts are entirely without jurisdiction to grant divorces or award custody of children, more recent decisions hold that strong policies of federal-state comity and deference to state expertise in the area are the theoretical underpinnings of federal courts' refusal to consider such cases.
>
> The policies favoring state court resolution are extremely strong. *Id.* at 632 (footnote omitted)

The *Levi* court then posited two examples of the above policy. In *Ohio ex rel. Popovici v. Agler*, 280 U.S. 379, 50 S.Ct. 154, 74 L.Ed. 489 (1930) a Romanian vice consul sought a writ or prohibition from the Ohio Supreme Court against divorce proceedings by his wife in Ohio state courts. Despite explicit constitutional and statutory language giving federal courts exclusive jurisdiction over proceedings against ambassadors and consuls, the United States Supreme Court affirmed a denial of the writ

on the ground that " 'the whole subject of domestic relations of husband and wife, parent and child, belongs to the laws of the states and not to the laws of the United States' ". 280 U.S. at 383 quoting *Ex Parte Burrus*, 136 U.S. 586, 593, 10 S.Ct. 850, 34 L.Ed. 300 (1890), a case involving a custody dispute between a child's father and grandparents. The Sixth Circuit also examined *Solomon v. Solomon*, 516 F.2d 1018 (CA 3 1975) where, after having extensively reviewed the "judicially caused" domestic relations doctrine, the Third Circuit refused to assert jurisdiction over a divorced wife's suit against her ex-husband for non-support. "The impact of the Supreme Court's language in these cases is that the federal courts do not have jurisdiction in domestic relations suits except where necessary to the effectuation of prior state court judgments involving the same matters or where jurisdiction lies by dint of" a clear federal question. *Id.* at 1025.

> The court emphasized that custody of the children was involved, that state court litigation on related issues was pending, and that a danger existed that the parties would attempt to play one court system off against another. *Id.* at 1025. The court also noted, "(T)he modern view (is) that state courts have historically decided these matters and have developed both a well-known expertise in these cases and a strong interest in disposition of them. *Ibid.* *Id.* 586 F.2d at 633.

After this review, the court in *Levi* found the reasons given by the court in *Younger* for declining jurisdiction and deferring to the state court to be relevant and cautioned that "(e)quitable principles *favor adjudication of issues in one proceeding rather than in multiple proceedings for the sake of fairness and judicial efficiency.*" 586 F.2d at 633. (Emphasis supplied)

Finally, the Sixth Circuit in *Tonti v. Petropoulous*, 656 F.2d 212 (CA 6 1981) a § 1983 action which grew out of proceedings rendered in an Ohio probate court, articulated in no uncertain terms:

> This litigation represents yet another misuse of 42 U.S.C. § 1983 in an attempt

to obtain federal jurisdiction. This civil rights statute was never intended as a catch-all under which a myriad of suits, traditionally within the exclusive jurisdiction of state courts, can be brought in the federal courts. *Ryan v. Aurora City Board of Education*, 540 F.2d 222, 225–26 (6th Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977) citing *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), *reversing* 505 F.2d 1180 (6th Cir. 1974). Jurisdiction cannot be attained in the federal courts by the procedural device of filing an insubstantial action under § 1983, *Bates v. Dause*, 502 F.2d 865, 867 (6th Cir. 1974).

Furthermore, this Circuit has made it plain that the filing of an action under § 1983 cannot serve as a basis for relitigating questions previously decided in the State courts. See *Coogan v. Cincinnati Bar Association*, 431 F.2d 1209, 1211 (6th Cir. 1970), in which this court said: "The Civil Rights Act was not designed to be used as a substitute for the right of appeal," or to make a collateral attack upon the final judgment of the highest court of a state and relitigate the issues which it decided.

In *Coogan*, this court pointed out that the remedy of the appellant was to petition the Supreme Court of the United States for a writ of certiorari. Tonti has resorted to that remedy and the Supreme Court denied the writ. [*Tonti v. Tonti*,] 434 U.S. 856, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977). *Id.* at 216.

As the Supreme Court delineated in *Huffman*, the *Levi* and *Tonti* courts recognize the inherent expertise of the state judicial system to resolve problems similar to the one at issue in the case *sub judice.* Federal intervention at this point in time is, therefore, inappropriate.

Based on the foregoing, Defendants' Motions to Dismiss are granted.