**William and Mary Lou CASTORR, Plaintiffs-Appellants,**

v.

**John M. BRUNDAGE, et al., Defendants-Appellees.**

**No. 81–1638.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 3, 1982.

Decided March 23, 1982.

Kurt Berggren, Ann Arbor, Mich., for plaintiffs-appellants.

Phillip E. Harter, Holmes, Harter & Mumford, Battle Creek, Mich., Janis Meija, William K. Basinger, Asst. Attys. Gen., Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., Janis Meija, Ronald W. Carlson, Asst. Attys. Gen., Lansing, Mich., for defendants-appellees.

Before KEITH and MERRITT, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge.

This appeal involves yet another effort to confer domestic relations and child custody jurisdiction upon a federal court. The complaint is a collateral attack upon the decision of appellee John M. Brundage, Judge of the Juvenile Division of the Probate Court of Calhoun County, Michigan, awarding custody of Donald Wayne Castorr, who was seven years old at the time of the decision of the Juvenile Judge. Custody was awarded to foster parents over the objection of appellants, the natural parents. The decision of Judge Brundage, dated June 22, 1977, is made an appendix to this opinion.

I

Judge Brundage was affirmed April 10, 1978, in a well reasoned seventeen page opinion rendered by Judge Stanley Everett of the Circuit Court of Calhoun County, Michigan, holding that the decision of Juvenile Judge was supported by clear and convincing evidence.

The Court of Appeals of Michigan affirmed the Circuit Court on June 28, 1979. The Supreme Court of Michigan denied leave to appeal on December 21, 1979.

As described by District Judge Benjamin F. Gibson, the complaint in the present case relies upon a "panoply of statutory, constitutional and common law doctrines." Jurisdiction was asserted in the following language:

This is an action for a Writ of Habeas Corpus, Preliminary and Permanent Injunction, Declaratory Judgment, and Damages, arising under Section 1 of the Civil Rights Act of 1971 [sic], 42 U.S.C. Section 1983, 1988; the First, Fifth, Ninth and Fourteenth Amendments to the United States Constitution, and common law habeas corpus to Article I, Section 6 of the United States Constitution. . . .

Plaintiffs sued for $500,000 in damages against all defendants and punitive damages of $10,000 against the foster parents and Patrick Anderson, a social worker of the Michigan Department of Social Services. Plaintiffs asked the district court to hold unconstitutional the Michigan statutes dealing with termination of parental rights and to order that the child, Donald, be returned to the custody and control of his natural parents. District Judge Gibson dismissed the complaint.

We affirm the decision of the district court on the following grounds:

(1) Plaintiffs' claim for habeas corpus relief is judicially inappropriate;

(2) The claims based on civil rights statutes are barred by res judicata;

(3) Judicial immunity bars plaintiffs' claim for damages against State Judge John M. Brundage.

(4) Plaintiffs' claim for damages against the Michigan Department of Social Services is barred by the Eleventh Amendment.

II

Donald Wayne Castorr, the youngest of the appellants' six children, was born on August 7, 1970. He weighed four pounds, 13 ounces at birth. Mrs. Castorr testified that she believed he weighed 17 or 18 pounds at one year of age. At the beginning of the school year in 1975, when Donald was five years old, the school authorities suggested that the Castorrs' family physician examine Donald, because he did not seem physically and psychologically prepared to attend school. The family physician referred Donald to Dr. Alfred Hamady, a pediatrician. Dr. Hamady examined Donald and decided to place him in the Leila Hospital in Battle Creek, Michigan, for more thorough examination.

At the time Donald was admitted to the hospital, he weighed 20 pounds and was 34¾″ in height. An average five year old boy weighs 40 pounds and is 40″ in height. If Mrs. Castorr's estimation of Donald's weight at age one is correct, Donald had gained only two or three pounds in four

years. Further, his bone development was that of a two to two and one-half year old, and he walked like a two year old. Donald was not yet toilet trained and still wore diapers at age five. In short, he was grossly underdeveloped mentally, physically and emotionally as compared to normal children of his age.

Donald's condition was diagnosed as "psychosocial dwarfism," or "deprivational dwarfism." This condition, according to Dr. Hamady, is caused by parental neglect, especially neglect by the mother. The lack of emotional interaction and maternal bonding between mother and child evidenced by absence of physical contact such as kissing, holding and hugging, can result in subnormal development in several respects, including height and weight.

A report on Donald's condition was given to the Michigan Department of Social Services (MDSS). The Department sought a temporary care order so that Donald's hospitalization could continue. Judge Brundage issued the temporary care order pending a preliminary hearing on September 19, 1975. At the preliminary hearing, Judge Brundage authorized the MDSS to file a petition against the Castorrs and placed the child in foster care following his discharge from hospitalization.

The petition was amended on February 17, 1976. On that same day, Judge Brundage held a jurisdictional hearing. The Probate Court took jurisdiction over Donald and made him a temporary ward of the court. The parents stipulated to several medical, sociological and psychological reports and consented to Donald's continued placement in foster care. Donald's parents were ordered to participate in counseling. The final decision as to whether Donald would return to his natural parents was deferred until a dispositional hearing.

Pending the dispositional hearing, Judge Brundage allowed limited visitations between Donald and his parents and ordered further medical and social evaluations of Donald's condition. At the dispositional hearing, Judge Brundage heard extensive testimony, including a considerable amount of expert evidence. The opinions of the expert witnesses conflicted on the question of whether the Castorrs' parental rights should be terminated. One fact, however, was clearly established. Donald's overall condition had improved dramatically since he had been removed from the Castorr home.

Donald was placed in the hospital on September 15, 1975. In less than a month he had gained five pounds in weight, probably more than he had gained in the preceding four years, and was one-half inch taller. On October 3, 1976, Donald was placed in the home of Mr. and Mrs. Leonard Shumate as foster parents. He was their first foster child. They had two other living children, a son age 12 and a daughter age five. They had lost a daughter at the age of two. Donald's remarkable "catch-up growth" has continued while he has been in the care of his foster parents. By August 23, 1976, Donald had gained 12 pounds and had grown five inches in height. An average child of his age would have gained four to five pounds and grown two inches in height during a comparable period.

There also were remarkable improvements in Donald's mental, social and psychological conditions. Mrs. Shumate testified that only two days were required to toilet train him. At the time he arrived at the Shumate home, Donald was afraid of the grass and the sun. He would eat only milk and dry cereal. Within a few weeks, he began sampling and eating other foods. He began to play with other children. He learned to dress himself and brush his teeth. He no longer feared taking a bath. His abusive and sometimes violent behavior had ceased. All the experts agreed that this was a textbook case of "psychosocial dwarfism" or "deprivational dwarfism," and that there was no doubt that Donald was a happier, healthier and better adjusted child after his placement in foster care.

Further testimony at the dispositional hearing indicated that Donald's natural parents, the appellants, had not realized the nature and cause of their son's condition. The experts who testified on behalf of the

Castorrs proposed a program in which Donald would return to the Castorr home, but the terms of the proposed program were vague and prospective and the chances for the program's success were not found to be convincing. Mr. and Mrs. Castorr did not testify. Judge Brundage concluded that "the child has suffered enough damage from underdevelopment that the court can not take the risk of further damage by returning the child to the custody of the persons in whose care the original damage occurred."

All four of the expert witnesses for the MDSS recommended termination of parental rights. The experts for both parties were in general agreement that a disposition should be made quickly.

After taking the case under advisement, Judge Brundage terminated the parental rights of the Castorrs. His rationale is set forth in his opinion, appendix hereto.

### III

District Judge Gibson appointed Thomas D. Geil, an attorney of Battle Creek, Michigan, as guardian ad litem and next friend for Donald Castorr, removing William Castorr as next friend to his son, because of the father's potential conflict of interest in challenging the validity of the order of the Juvenile Judge. Mr. Geil also had been appointed guardian ad litem by Judge Brundage in the State court proceedings. The guardian ad litem has filed an able and convincing 27 page brief in this court urging affirmance of the decision of the district judge. Since Mr. Geil was serving as guardian ad litem and next friend for Donald, the district court held that only he would have standing to seek a writ of habeas corpus, and that Mr. and Mrs. Castorr did not have standing to seek habeas corpus relief.

We agree there are strong arguments in favor of denying standing for parents who bring a habeas petition on behalf of a child after termination of parental rights. See Lehman v. Lycoming County Children's Services, 648 F.2d 135, 151–55 (3rd Cir. 1981) (en banc) (Adams, J., concur-

ring), cert. granted, —— U.S. ——, 102 S.Ct. 89, 70 L.Ed.2d 82 (1981). We note, however, that early English common law cases held that habeas corpus was a proper procedure for parents to regain the custody of their children. See, e.g., Lyons v. Blenkin, 1 Jac. 245, 37 Eng.Rep. 842 (Ch.1821). We also note that several states, including Michigan, allow parents to bring habeas corpus actions to obtain custody of minor children. See, e.g., M.C.L. § 600.4319.

The Castorrs failed to avail themselves of this alternative State procedure. They did not attack the constitutionality of the Michigan parental rights termination statutes until their application for leave to appeal to the Supreme Court of Michigan. A federal court is not the proper forum for child custody proceedings, especially where State remedies are available. Since the writ of habeas corpus involves principles of comity, it should be used only in cases involving severe restraints upon individual liberty. Hensley v. Municipal Court, 411 U.S. 345, 351, 93 S.Ct. 1571, 1574, 36 L.Ed.2d 294 (1973).

These principles of comity and the availability of adequate State remedies lead this court to conclude, as we did in Anh v. Levi, 586 F.2d 625, 632 (6th Cir. 1978), that federal courts should not assert jurisdiction over the appellants' habeas corpus claim under the facts in this case. The majority of the United States Courts of Appeals which have considered the question of whether habeas corpus is available to parents who contest child custody disputes have found the extraordinary writ to be inappropriate. See Doe v. Doe, 660 F.2d 101, 103–05 (4th Cir. 1981), referring to decisions of six other circuits.

Finally, it is not clear that the appellants have exhausted their State remedies, as required by 28 U.S.C. § 2254(b). They did not raise their constitutional contentions until their application for leave to appeal to the Michigan Supreme Court. Given the reluctance of the federal courts to entertain jurisdiction over the "whole subject of domestic relations of husband and wife, par-

ent and child," *Ohio ex rel. Popovici v. Agler*, 280 U.S. 379, 383, 50 S.Ct. 154, 155, 74 L.Ed.2d 489 (1930), we conclude that deference to state expertise in the field of domestic relations requires us to refuse to accept jurisdiction over the habeas corpus claims of appellants.

## IV

The district court held that the appellants' claims under 42 U.S.C. § 1983 and the United States Constitution were barred by principles of res judicata.

In *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), the Supreme Court recognized that there is a split in the circuits on the question of whether "normal rules of claim preclusion" should apply in § 1983 suits in which the plaintiff "seeks to litigate in federal court a federal issue which he could have raised but did not raise in an earlier state court suit against the same adverse party." *Id.* at 97, n. 10, 101 S.Ct. at 416 n. 10. The Court declined to express a view on the issue since it was not before it. *Id.*

The appellants assert the above issue is now squarely before this court. They contend that they did not litigate their constitutional claims in State court; they raised the constitutional questions for the first time in their application for leave to appeal to the Michigan Supreme Court. They argue that the constitutional issues are so important that their claims should not be barred by principles of res judicata especially when appellants "impliedly reserved their constitutional issues by raising them only at an appellate level where there was no appeal as of right."

Without considering the inconsistency between the above argument and the claim of appellants that they have exhausted their State remedies for the purposes of their habeas corpus petition, we follow *Coogan v. Cincinnati Bar Ass'n*, 431 F.2d 1209 (6th Cir. 1970), which places the Sixth Circuit with those circuits holding that a § 1983 claimant "is precluded by the doctrine of res judicata from relitigating not only the issues which were actually involved in the

[state] proceeding, but also the issues which he might have presented." *Id.* at 1211.

Appellants contend that the statement quoted above in *Coogan* was only dictum, and that in *Getty v. Reed*, 547 F.2d 971 (6th Cir. 1977), this court held that res judicata is inapplicable when the claims not raised in the state proceedings attack the constitutionality of a state statute. We disagree.

The State court decision which the appellant in *Coogan, supra*, 431 F.2d 1209, sought to attack collaterally is reported as *Cincinnati Bar Ass'n v. Coogan*, 21 Ohio St.2d 147, 256 N.E.2d 218, *cert. denied*, 400 U.S. 866, 91 S.Ct. 103, 27 L.Ed.2d 105 (1970). In the State opinion, there is no mention of the constitutional claims raised by Coogan. The plain language of this court's opinion in *Coogan, supra*, 431 F.2d 1209, is that Coogan not only could not relitigate those issues actually litigated in the State proceedings, but also "the issues which he might have presented." *Id.* at 1211.

In *Getty, supra*, 547 F.2d 971, the question was not whether res judicata was applicable, but whether the district court had jurisdiction over the complaints. In his opinion for the court Judge Edwards specifically stated that the decision was "without reference . . . to such defenses as res judicata and collateral estoppel." *Id.* at 974.

■ We do not hold that the application of the principles of res judicata and collateral estoppel is mandatory in every case. They are an expression of the policy of federal courts preferring finality, *i.e.*, that litigation at some time must become final. In the face of more important federal policies, however, the preference for finality might be outweighed by more compelling considerations. We do not foreclose the possibility that certain § 1983 claims might not be barred by res judicata under proper circumstances. We hold only that the facts of this case do not present a proper situation in which to find an exception to the principles of res judicata.

Cases involving matters of probate, see *Tonti v. Petropoulous*, 656 F.2d 212 (6th Cir. 1981), or domestic relations, as in the

present proceeding, present situations in which the importance of finality is compelling. Further, in these types of cases, federal courts historically have deferred to the expertise of State courts, and have avoided accepting jurisdiction under the principles of comity. Thus, substantive federal policy supports the application of res judicata to the § 1983 constitutional claims of appellants.

## V

■ We hold that Judge John M. Brundage is absolutely immune from liability for money damages. *Stump v. Sparkman*, 435 U.S. 349, 359–60, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331 (1978).

■ We further hold the claim of appellant for money damages against the Michigan Department of Social Services is barred by the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

The judgment of the district court is affirmed. No costs are taxed. Each party will bear his or its own costs on this appeal.

### APPENDIX

STATE OF MICHIGAN
JUVENILE DIVISION OF THE
PROBATE COURT
COUNTY OF CALHOUN

IN THE MATTER OF:

Donald Wayne CASTORR,
Minor Child

### FINDING

This matter first came before the Court on September 19, 1975, on a complaint filed by the Protective Services Unit of the Michigan Department of Social Services alleging that the minor child was underdeveloped and malnourished and that the parents had failed to obtain necessary medical attention for the minor child.

At a preliminary hearing on September 19, 1975, a Referee of this Court authorized the filing of a petition and placed the child in foster care after the child was discharged from then present hospitalization. The au-thorized petition was filed September 24, 1975, and it was later permitted by the Court to be amended on February 17, 1976. The petition as amended alleged under the Michigan Juvenile Code that the parents of Donald Wayne Castorr failed to provide necessary medical attention for the minor child, that the child was deprived of emotional well being and that the home of the parents was an unfit place for the child to live because of such neglect of the parents.

The petition came on for a jurisdictional hearing on February 17, 1976, at which time the Court took jurisdiction over the minor child and made the child a temporary ward of the Court pursuant to the consent and stipulation of the parties, who also at that time stipulated several medical, psychological and social reports into evidence. The child was continued in foster care pursuant to the Court order entered on that date, and the parents of the minor child were ordered to participate in counselling as directed by the Court.

During the time pending the dispositional hearing in this case, the Court ordered certain limited visitations between the parents and minor child, and the Court ordered further medical and social evaluations of the minor child. After hearing certain motions and ordering further limited visitation, the matter came on for the dispositional hearing at which extensive testimony was heard on February 9 and 10 and March 14, 1977.

At the dispositional hearing this matter was the subject of considerable expert testimony, which the Court heard on two occasions into the late evening hours in order to accommodate the schedules of the witnesses and counsel. In addition, six depositions and twelve exhibits were admitted into evidence with the exhibits involving extensive medical records as well as a book and articles on the medical and psychological aspects of psychosocial dwarfism also referred to as deprivational dwarfism.

The Court took extensive notes during the testimony, and the Court has expended exhaustive hours reviewing the testimony, depositions and exhibits in preparation for making this finding.

The medical testimony in this case from Dr. Alfred Hamady, a Battle Creek, Michigan, pediatrician, and Dr. Nancy Hopwood, a pediatric endocrinologist from the University of Michigan Medical Center, clearly showed, and the Court so finds, that the child was suffering from deprivational dwarfism. When the child was admitted to Leila Y. Post Montgomery hospital in Battle Creek on September 15, 1975, the child weighed 20 pounds and was 30¾ inches in height. The testimony disclosed that both measurements placed the child far below normal growth for a five year old child. The testimony further indicated that the child was at approximately the two year level developmentally, far below his chronological age. Further testimony showed that this child had all the classic symptoms supporting a diagnosis of deprivational dwarfism, and that such condition is caused by the emotional environment in the child's home.

The principal issue in the dispositional hearing focused on the medical, psychological and social management of the case. Testimony disclosed that the child had gained eight pounds in the first two months of foster care, and weighed 35½ pounds and was 40¼ inches tall after a year in foster care. Dr. Hopwood testified that such rapid catch-up growth was typical of deprivational dwarfism cases when the child was taken out of the parental home and placed in foster care. Dr. Hopwood and Marjorie Bowden, chief social worker at the University of Michigan Medical Center for the departments of obstetrics, pediatrics and gynecology, both testified that the only appropriate remedy for a deprivational dwarfism case of this age and type would be termination of parental rights and subsequent placement of the child for adoption.

Dr. Donald Rossi of Hillsdale, Michigan, and Dr. Ruth Rice of Plano, Texas, both child psychologists, and Vicki Ann Leonard, a pediatric social worker from Ann Arbor, Michigan, testified that the case could be treated by returning the child to the care and custody of his parents together with intensive and continuing psychotherapy and social service support. This treatment approach is founded on the premise that such intervention will change the parents to the degree that the emotional environment will be modified so that the minor child will continue his catch-up growth.

A considerable amount of testimony at the hearing and in the depositions centered on whether the parents of the minor child could make sufficient changes through psychotherapy to produce an environment where the child could safely grow. Ethel Dudde, a psychiatric social worker at the Battle Creek Child and Adult Guidance Clinic; Dr. Weicher R. VanHouten, a University of Michigan Medical Center psychiatrist and a consulting psychiatrist at the same clinic; Dr. Rossi and Dr. Rice all testified on this point. The Court finds that the testimony in summary indicated that the parents of the minor child refused to have any significant insight into the causal relationship regarding the condition of their minor child and had not profited from counselling during the year prior to the dispositional hearing. Further, the testimony showed Mr. Castorr to have a rigid, hostile personality, and Mrs. Castorr to be suffering from depressive problems. The testimony indicated that both parents need psychotherapy for themselves, and the Court finds that their prognosis for change as parents in relation to the problems existing with Donald Wayne Castorr is very poor. The Court is convinced and finds that the parents do not have the necessary motivation and understanding to change the emotional environment significantly enough to insure the minor child's continued growth in their care. Even Dr. Rice, called on behalf of the parents, testified that if the parents are not receptive to change the only proper remedy in this case would be the termination of parental rights.

Testimony from two other witnesses support the Court's findings in this case. Gloria Shumate, the foster mother, testified that she regularly had substantial behavioral problems with the minor child when he returned from parental visits. The visits occurred during the time the parents were participating in regular counselling with

Ms. Dudde, and the Court concludes and finds that the emotional problems that caused the diagnosis of deprivational dwarfism were recurring during the parental visitations.

The diagnosis of the child's deprivation is further supported by the testimony of Harold Oliver, a witness called by the parents, who indicated he had been a neighbor of the Castorrs for eight years. He described how he had seen the Castorrs involved in their yard in family activities with their children on many occasions over the years, and yet on cross examination he had never seen the minor child Donald Wayne Castorr in the Castorr yard on any of these family activity occasions.

From a thorough evaluation of all the testimony and exhibits in this case, the Court is compelled to the conclusion by clear and convincing evidence that this case requires the termination of parental rights in the best interests of the minor child. The Court realizes that the parents desire to have the child returned home, but the Court is convinced that the emotional conditions are such that the parents can not provide a fit home in which the minor child can grow. It is the opinion of the Court that to return the child to the care of the parents, even with supporting services, would be to experiment with the well being of the child. It is the further opinion of the Court that the child has suffered enough damage from underdevelopment that the Court can not take the risk of further damage by returning the child to the custody of the persons in whose care the original damage occurred.

Consequently, an Order terminating parental rights and making the child a permanent ward of the Court consistent with this finding will enter.

The Court wishes to commend all counsel for their diligence in preparing and presenting this very difficult case. The Court recognizes that all counsel thoroughly researched material and otherwise ably prepared for this case, and the Court appreciates such effort which permitted the issues to be sharply defined and fully explored.

/s/ JOHN M. BRUNDAGE,
Judge of Probate

June 22, 1977